**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Willie E. SLOAN, Defendant–Appellant.**

**No. 94–5181.**

United States Court of Appeals, Fourth Circuit.

Argued July 11, 1994.

Decided Sept. 29, 1994.

---

**ARGUED:** Joseph Blount Cheshire, V, Cheshire, Parker & Manning, Raleigh, NC, for appellant. John Douglas McCullough, Asst. U.S. Atty., Raleigh, NC, for appellee. **ON BRIEF:** Robert Manner Hurley, Cheshire, Parker & Manning, Raleigh, NC, for appellant. Janice McKenzie Cole, U.S. Atty., Raleigh, NC, for appellee.

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

Reversed by published opinion. Judge MOTZ wrote the majority opinion, in which Judge MICHAEL joined. Judge NIEMEYER wrote a dissenting opinion.

## OPINION

MOTZ, Circuit Judge:

The sole question presented here is whether the declaration of a mistrial was justified by "manifest necessity." After five trial days in which twenty government witnesses and nine defense witnesses had testified, the district court, *sua sponte* and over the objection of appellant, Willie E. Sloan, declared a mistrial. The court concluded that because defense counsel had previously indicated Sloan would testify, Sloan's ultimate decision not to testify required declaration of a mistrial. When the government sought to retry Sloan,

he moved to dismiss the indictment asserting that the prosecution was barred "on the grounds of double jeopardy." The district court denied that motion and Sloan noted an interlocutory appeal. *See Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *United States v. Von Spivey,* 895 F.2d 176, 177 (4th Cir.1990). Because Sloan's decision not to testify did not create a "manifest necessity" requiring declaration of a mistrial, we must reverse. Further prosecution of Sloan on the charges involved in this appeal is now barred by the Double Jeopardy Clause.

## I.

On April 13, 1993, a ten-count indictment was returned against Sloan in the Eastern District of North Carolina. Sloan was indicted for acts allegedly committed while he served as President of Local 1426 of the International Longshoremen's Association (ILA). These acts included acceptance of payment from an employer in violation of the Taft–Hartley Act, 29 U.S.C. §§ 186(b)(1) and (d)(2) (Count I), various embezzlements from the union in violation of 29 U.S.C. § 501(c) (Counts II—IX), and mail fraud in violation of 18 U.S.C. § 1341 (Count X).

Sloan's trial commenced on December 6, 1993. After the court gave the jury preliminary instructions including the direction that "statements, arguments and questions by the lawyers are not evidence," and "[o]pening statements are neither evidence nor arguments," the prosecutor and defense counsel presented their respective opening statements. Defense counsel's opening statement included, in the government's words, an "Horatio Alger-like" account of the "long history of Willie E. Sloan's rise from humble origins to that of a union President." The portion of the defense opening statement, which the government asserts "became improper when the defense was unable to produce the testimony via the defendant" to support it, is set forth in its entirety in the Appendix to this opinion. Although at trial the prosecutor objected—successfully—several times to other portions of the defense's opening statement (that statement consumes 32 pages of the transcript), no objection was made at trial to any part of the opening statement set forth in the Appendix. At no time in his opening statement did defense counsel state that Sloan would testify.

During the testimony of the government's eighteenth witness, James Earl Carroll, defense counsel first represented that Sloan would testify. Defense counsel wanted to impeach Carroll with a 1983 conviction for bribery and racketeering, asserting that it was because of Carroll's criminal history, not any private animus, that Sloan did not want Carroll to be a union member. The prosecutor conceded that he could not "disagree with [defense counsel's] reasoning," but that many union members had criminal records, which he had "refrained from bringing out" because there was no union prohibition against members with prior criminal convictions. At that point the following colloquy ensued:

The Court: Do you know—is your client going to testify?

[Defense Counsel]: Yes, sir.

The Court: I think I will sustain [the government's] position on this and you can ask him if it was a factor in his determination.

[Defense Counsel]: In order to understand then, it would not be—your honor doesn't feel like in your discretion that the fact that he has admitted bribery here and he's been convicted of bribery in a federal court would be proper impeachment? I mean, I would agree if he hadn't admitted that he'd done it again.

The Court: It's over ten years old and if your man [Sloan] knows about it, he can certainly testify to the fact, whatever it was.

In accordance with the district court's ruling, defense counsel did not refer to Carroll's previous bribery conviction when cross-examining Carroll.

The question of Sloan's testimony arose again during the testimony of the next government witness, Scipio Hawkins, a former member of the ILA executive board. Although Hawkins denied knowledge of any attacks on Sloan or any threats outside of those in one union meeting, he acknowledged that he knew that Sloan had filed four griev-

ances and a letter with the executive board asserting that he had been attacked by union members. Defense counsel wanted to use the substance of the grievances and letter to impeach Hawkins. The court ruled that Hawkins could identify the documents, but could not be impeached with their contents. Defense counsel stated that, "I'd like for him [Hawkins] as a member of the executive board to identify these as grievances . . . . and if he says yes . . . I'm going to put [them] into evidence"; the government did not object to this "limited extent of . . . cross-examination." The following exchange then occurred:

The Court: His [Sloan's] statement—if he[Sloan] wants to testify as to his reasons [for filing grievances], he's got to take the stand to do so.

[Defense Counsel]: I understand, and he shall.

The Court: I understand that you're telling me that he will. But I think that he [Hawkins] can identify them [the grievances and letter]. . . .

[Defense Counsel]: . . . if he [Hawkins] can identify these documents as the fact that he got them, then when you compare Willie Sloan's testimony to Scipio Hawkins' testimony, it clarifies both of their testimony for the jury.

The Court: Well, I think they're probably admissible if they're in your case in chief. If Mr. Sloan testifies that he did that, that he filed grievances, and there's no suggestion of any recent fabrication, I think that's probably it. . . .

Although defense counsel thus received permission to ask Hawkins to identify the documents, defense counsel never did so. When the trial resumed following the luncheon recess, defense counsel did not ask Hawkins *any* questions about the documents.

After the government's final witness testified, the government rested its case-in-chief

and dismissed five of the embezzlement counts (Counts V–IX). Extensive argument followed on the defense motion to dismiss the remaining counts; the court ultimately denied that motion.[1] The following day, a Friday, the defense began its case-in-chief. The third time the question of whether Sloan could testify was raised was during the testimony of defense witness, Andrew Canoutas, an attorney who had represented Local 1426 and the Sloan family. The prosecutor at a bench conference stated:

I want to get into the issue of bias of this witness, and the fact that [Canoutas] has filed false affidavits, as a matter of impeachment. I don't want to bring out this court's name or anything else, but I want to show that . . . in representing Mr. Sloan in a prior federal civil action, in which[Canoutas] filed a false affidavit, that sanctions were imposed. . . . [Canoutas] represented his client, and he filed a false affidavit on behalf of his client.

After indicating that it did not "recall" the prior case, the court did not permit this impeachment of Canoutas reasoning that Canoutas had not been sanctioned for deceitful conduct, *i.e.*, submitting false affidavits, but only for "negligent" conduct, *i.e.*, submitting the affidavits without making an investigation. The prosecutor then stated that he intended to ask any witness who had filed a false affidavit about the affidavit and to "ask character witnesses have they heard that Mr. Sloan had filed false affidavits . . . . [defense counsel] says his client's going to testify." The court declined to decide the propriety of such questions, preferring to wait until they arose.

During redirect examination of Canoutas, defense counsel inquired about a deed of trust that Canoutas had prepared for Sloan. When the government's objection was sustained, defense counsel argued that the government had been permitted to ask about the deed of trust on cross-examination "for the

---

1. In doing so the court indicated that it believed the government's case as to Counts I, II, III, and IV was problematic. With regard to Count I, the asserted violation of the Taft–Hartley Act, the court remarked:

I have a lot a problems with it, for a variety of reasons. . . .

With respect to Counts II, III and IV, the court noted:

. . . if Mr. Sloan was, or assumed that he was, under the negotiated agreement and was paid from that source, I don't think there was enough evidence of any intent of the offense.

purpose of making it look as if there was something strange about Mr. Canoutas doing it." The court continued to sustain the government's objection to the question on the grounds of hearsay, and defense counsel argued, "If Mr. Sloan is going to testify to it, wouldn't it be corroborative of Mr. Sloan's testimony." The court responded that Sloan could "testify to it" if he wished to but that, because there was "nothing to corroborate in the record at this point," Canoutas could not be questioned on the matter.

During the testimony of the ninth defense witness, · Buster Smalls, the question of Sloan's filing a false affidavit and whether he would testify again arose. The government and defense counsel approached the bench and this colloquy ensued:

> [Prosecutor]: ... I take it people like this are essentially character witnesses ... I think at this point I should have the right to ask them have you heard that Mr. Sloan, in litigation concerning union members, filed what was found to be false affidavits, since he has come here and testified about what a visionary wonderful president he thinks he is.
>
> . . . .
>
> [Defense Counsel]: I think that under the statute, one, I should have been given some notice of that; two, the only thing I've seen is the *Wilmington Star News*—having read the *Wilmington Star News*, and I know that I don't know if it's absolutely accurate. I know your honor was in the case but you said you didn't really remember it.
>
> The Court: I remembered after we went out. I'll tell you what happened. There were affidavits filed by both the employers and the union ... and both ... were false.

> [Defense Counsel]: I'd like to at least have the opportunity—and maybe its so late on Friday at least have the opportunity to look at that and find out what it is so I could craft my ability to answer.
>
> . . . .
>
> [Defense Counsel]: ... I've got ... another 20 minutes before I put on Mr. Sloan and he'd be my last witness. And since it's so close, I would ask your honor if we would recess.... [2]

The discussion that followed indicated that the court believed that the government probably would be able to use the false affidavit to impeach Sloan and other witnesses, and that both the court and counsel intended to resume the trial on the following Tuesday as planned.[3] Before concluding proceedings for the day, the prosecution promised to make the relevant pleadings in the earlier lawsuit available to defense counsel.

There was no testimony (and so there is no transcript) as to what happened over the next few days. According to defense counsel's affidavit, filed after the mistrial, he spoke with Sloan on Friday afternoon about the possible impact the sanction for filing a false affidavit in the prior case would have on Sloan's testimony in the case at hand. Under the circumstances (the judge presiding in the case at hand had also issued the sanction), counsel was concerned that he could not effectively challenge or criticize the prior sanction ruling. On Friday afternoon, defense co-counsel assertedly suggested for the first time that Sloan not testify because he perceived the government's case as so weak that there was no need to put Sloan on the stand and risk impeachment. Although lead defense counsel and Sloan initially rejected this suggestion, by Monday afternoon they agreed that he should not testify. Soon after

---

**2.** In an affidavit filed after the mistrial was declared, defense counsel stated that this exchange was "when counsel first learned that the trial court in the instant matter had, in an earlier and unrelated civil trial, ruled that Mr. Sloan had filed a 'false affidavit' in support of a Motion for Summary Judgment." Only Sloan's affidavit (not the district court's ruling on it) was included in the *Jencks* material that the government turned over to the defense. In this court, the

government does not dispute the veracity of defense counsel in this regard but it does maintain that it "cannot understand how the defense could have covered Sloan's affidavits with him and failed to perceive the possibility of devastating cross-examination."

**3.** The court had other obligations that precluded it from resuming trial in this case on Monday.

reaching this decision, they notified the court's "senior legal counsel."

At a pre-trial chambers meeting, which began at approximately 8:50 a.m. on Tuesday, the court asked defense counsel whether Sloan would testify. Counsel responded that "unless things changed that day," he would not. According to defense counsel's affidavit, at this time the court "immediately" stated that it would declare a mistrial "because it had relied on counsel's statement that Mr. Sloan would be a witness when it made certain rulings and felt sure the Government was prejudiced because it might have offered other objections or witnesses had it known the defendant would not testify." A "stunned" defense counsel objected that he could remember "few, if any, rulings" based on representations that Sloan would testify and that the government had had "ample opportunity" to call the witnesses it wanted and to cross-examine defense witnesses. According to defense counsel, the court then remarked that "the only way the case would not be mistried was if the government did not want it to be. The government asked to confer with its agents and, after doing so, the government stated that it wanted a mistrial." Although, as indicated above, all of the information as to the weekend activities and the chambers ruling comes from defense counsel's affidavit, in neither its response to defense counsel's affidavit nor its appellate brief does the government dispute any of the above facts except that it asserts defense counsel notified the court of Sloan's decision not to testify on Friday and denies that it "wanted" a mistrial. Rather, the government claims it "merely acceded to what the Court was clearly going to do." [4]

When at 9:53 a.m. on Tuesday the judge reconvened the jury and informed it of the mistrial, he explained:

It has come to my attention, since Friday, and to the attention of counsel—I don't think it was a situation that anyone was aware of, that in former years there was a lawsuit that could have, not necessarily have, but it could have some bearing on some of the issues or matters that are being discussed at this time. Counsel was unaware of that situation and the court was, as well.

We have discussed the matter at some length this morning, and because of that pre-existing litigation and some of the determinations that were made therein, and because of the fact that [under] the theory of this suit its conduct of this trial was predicated upon certain assumptions by the lawyers and the court, the court has concluded that in the interest of justice that it should declare a mistrial in this case....

Fifteen days later, after counsel for both sides were given the opportunity to file affidavits,[5] the court issued a written order in which it further explained its ruling:

[D]efense counsel's representations to [the court] and to the United States preempted a fair determination of the issues. The court's determination in this regard was premised upon the fact that from the trial's inception, defense counsel on several occasions unequivocally asserted to both the court and to the United States Attorney that the defendant would testify on his own behalf. The court relied upon such representations in its rulings upon evidentiary issues in both the Government's and the defendant's cases-in-chief, admitting evidence presumed to be corroborative of defendant's anticipated testimony. Implicit in the United States Attorney's response, or lack thereof, to defense counsel's ques-

---

4. For purposes of this opinion, we accept the government's assertion that it did not "want" a mistrial, but only "acceded" to one. There is, however, no support in the record for the government's claim that the court knew about Sloan's decision not to testify on Friday or, indeed, that this decision was made prior to Monday afternoon. In fact, although Sloan's counsel told the court's senior counsel of the decision on Monday afternoon, the court's orders explaining the basis for the mistrial declaration specifically state the court itself learned on *Tuesday* for the

first time that Sloan would not testify. Moreover, in a memorandum in the court below, the government asserted that "[o]n December 14, 1993 (Tuesday), the defense stated, for the first time, that the defendant would not be called as a witness."

5. Only defense counsel filed an affidavit, which is referred to above; the government merely filed a "response" to that affidavit.

tions to witnesses and their answers was the former's reliance in the same regard, i.e., his failure to object to certain questions and answers during cross-examination was evidence of his reliance on defense counsel's representations.

On December 14, 1993, defense counsel advised the court that during the preceding weekend he had become aware of evidence of an impeaching nature and of such severity that the defendant should not testify.

The court deems it unnecessary to evaluate the premise for defense counsel's decision. In the court's view, reliance upon defense counsel's unequivocal assertion that defendant would testify rendered the trial fundamentally unfair to the United States. The integrity of the judicial process demands that the court and the attorneys who appear before it as its officers be able to rely upon the others' respective representations. To countenance otherwise would strike at the foundation of the judicial process. The day has not arrived when court officers deal with each other at their peril.

Sloan then moved the district court to recuse itself. In its opinion denying that motion, the court stated once again that "[i]n ruling on a number of evidentiary matters" it had "relied on defense counsel's representations that defendant would testify during his case-in-chief"; the court then cited four of the occasions set forth within, i.e., during the Carroll, Hawkins, Canoutas, and Smalls testimony. The court also reiterated that it did not "fault" or "blame" defense counsel for the mistrial or assert that the late decision not to have Sloan testify was "a premeditated ploy."

When the case was scheduled for retrial, Sloan moved to dismiss the indictment on the "grounds of double jeopardy." The court denied the motion stating that to "preclude a retrial in this matter would be manifestly unjust and unfairly would exalt form over substance." The court found it "unnecessary" to address the arguments set forth by Sloan, but "observe[d] that a trial transcript will not reflect comments made in chambers or off the record, or the silence of the court or counsel in reliance thereon. Nor will a transcript reflect the court's unspoken

thought processes in presiding over a trial and in ruling on matters arising therein." From this order, Sloan filed an interlocutory appeal and the district court stayed the trial.

## II.

■ When a mistrial is declared over a criminal defendant's objection, retrial is permitted only when "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). First enunciated 170 years ago, this bedrock principle has been consistently reiterated and followed. *See, e.g., Arizona v. Washington,* 434 U.S. 497, 506 n. 18, 98 S.Ct. 824, 830 n. 18, 54 L.Ed.2d 717 (1978); *Illinois v. Somerville,* 410 U.S. 458, 461, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973); *United States v. Jorn,* 400 U.S. 470, 481, 91 S.Ct. 547, 555, 27 L.Ed.2d 543 (1971); *United States v. Shafer,* 987 F.2d 1054, 1057 (4th Cir.1993). Its basis is the Fifth Amendment's Double Jeopardy Clause: no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Because jeopardy attaches before the judgment becomes final," it has been held that the double jeopardy clause protects a defendant's "valued right to have his trial completed by a particular tribunal," and so prohibits the declaration of a mistrial absent manifest necessity. *Washington,* 434 U.S. at 503, 98 S.Ct. at 829 (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)); *Jorn,* 400 U.S. at 484, 91 S.Ct. at 556–57 (also quoting *Wade,* 336 U.S. at 689, 69 S.Ct. at 837).

■ A trial court has "broad discretion" in determining whether manifest necessity requires declaration of a mistrial. *Somerville,* 410 U.S. at 462, 93 S.Ct. at 1069. Thus, an appellate court reviews a trial court's invocation of the manifest necessity doctrine and denial of a motion to dismiss a subsequent indictment only for an abuse of this discretion. *Shafer,* 987 F.2d at 1058; *Harris v. Young,* 607 F.2d 1081, 1085 (4th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). A judge cannot find that

manifest necessity requires declaration of a mistrial "until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Jorn,* 400 U.S. at 485, 91 S.Ct. at 557. Furthermore, "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for ... deference by an appellate court disappears." *Washington,* 434 U.S. at 510 n. 28, 98 S.Ct. at 832 n. 28.

A trial judge need not make an explicit finding of manifest necessity. *Id.* at 516–17, 98 S.Ct. at 835–36. But in determining if a judge has failed to exercise sound discretion, the Supreme Court has looked to whether the judge (1) "act[ed] precipitately ... [or] gave both defense counsel and the prosecutor full opportunity to explain their positions," *id.* at 515–16, 98 S.Ct. at 835; (2) "accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding," *id.* at 516, 98 S.Ct. at 835; and (3) considered alternatives to declaring a mistrial. *See, e.g., Jorn,* 400 U.S. at 487, 91 S.Ct. at 558; *see also Von Spivey,* 895 F.2d at 178; *United States v. Sartori,* 730 F.2d 973, 976 (4th Cir.1984); *Harris,* 607 F.2d at 1085. Indeed, the need for careful consideration of alternatives to mistrial, and the hard lesson of retrials barred by double jeopardy when there was no such consideration, was one of the factors that led to the promulgation of Fed.R.Crim.P. 26.3, which took effect just five days before the commencement of Sloan's trial. That rule requires that "[b]efore ordering a mistrial, the court shall provide an opportunity for the government and for each defendant to comment on the propriety of the order, including whether each party consents or objects to a mistrial, and to suggest any alternatives." Fed. R.Crim.P. 26.3.

Although the constitutional basis for the manifest necessity doctrine and the standard of review of a trial court's invocation of that doctrine are clear, precisely what constitutes manifest necessity is not at all clear. The Supreme Court has emphasized that because these cases turn on their own facts they "escape meaningful categorization." *Somer-*

*ville,* 410 U.S. at 464, 93 S.Ct. at 1070; *see also Washington,* 434 U.S. at 506, 98 S.Ct. at 831 (manifest necessity standard cannot be "applied mechanically"); *Jorn,* 400 U.S. at 485, 91 S.Ct. at 557 (Supreme Court has refused to make rules "based on categories of circumstances"); *Downum v. United States,* 372 U.S. 734, 737, 83 S.Ct. 1033, 1035, 10 L.Ed.2d 100 (1963) ("[e]ach case must turn on its facts."); *Sartori,* 730 F.2d at 975. A single test is thus not appropriate, or even possible.

■ It is well established, however, that "manifest necessity" means that a "high degree" of necessity is required before a "mistrial is appropriate." *Washington,* 434 U.S. at 506, 98 S.Ct. at 830; *United States v. Council,* 973 F.2d 251, 255 (4th Cir.1992); *see also Somerville,* 410 U.S. at 471, 93 S.Ct. at 1073 (declaration of mistrial "where jeopardy has attached is not ... to be lightly undertaken"); *Downum,* 372 U.S. at 736, 83 S.Ct. at 1034 ("valued right" of a defendant to have trial completed by the same jury "may be subordinated to the public interest—when there is an imperious necessity to do so"); *United States v. Coolidge,* 25 F.Cas. 622, 623 (1815) (mistrial to be granted "only in very extraordinary and striking circumstances"). Accordingly, "the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar" and that burden is a "heavy one." *Washington,* 434 U.S. at 505, 98 S.Ct. at 830; *see also Council,* 973 F.2d at 255.

■ While a declaration of mistrial "to afford the prosecution a more favorable opportunity to convict" is, of course, barred, this sort of "extreme" case does not "mark the limit" of the double jeopardy "guarantee." *Downum,* 372 U.S. at 736, 83 S.Ct. at 1034. In fact, the Supreme Court has rejected the view that the double jeopardy bar can only be invoked as the result of a "mistrial declaration which 'unfairly aids the prosecution or harasses the defense.' " *Jorn,* 400 U.S. at 483, 91 S.Ct. at 556 (quoting Govt. Brief at 8). This is so because "independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury." *Jorn,* 400 U.S.

at 485, 91 S.Ct. at 557; *see also Washington,* 434 U.S. at 508 n. 25, 98 S.Ct. at 832, n. 25 (defendant's right to have the empaneled tribunal decide his case is implicated "whenever a mistrial is declared over the defendant's objection and without regard to the presence or absence of governmental overreaching") (quoting *Jorn,* 400 U.S. at 485, 91 S.Ct. at 557). Accordingly, "even in circumstances where the problem [giving rise to the possible declaration of mistrial] reflects error *on the part of one counsel or the other,* the trial judge must still take care to assure himself that the situation" constitutes manifest necessity warranting declaration of a mistrial. *Jorn,* 400 U.S. at 486, 91 S.Ct. at 557 (emphasis added).

■ In order to invoke the "double jeopardy bar," a defendant need not demonstrate that the declaration of a mistrial prejudiced him in any way other than infringement on the "valued right" to have the empaneled tribunal decide his cause. *Somerville,* 410 U.S. at 471, 93 S.Ct. at 1073–74. Thus, the Double Jeopardy Clause may preclude retrial when a mistrial was neither requested nor desired by the prosecution. *See Jorn,* 400 U.S. at 490, 91 S.Ct. at 559 (majority holds declaration of mistrial was not supported by manifest necessity, although, in words of the dissent, "the mistrial was not requested by the prosecutor, and there is not the slightest indication that he desired it to occur.") (Stewart, J., dissenting). *See also United States v. Council,* 973 F.2d at 255 (mistrial improper even when not requested or desired by government and only

declared because of "the interest of the defendant"); *Sartori,* 730 F.2d at 977 (mistrial improper although not requested or desired by government and declared solely because of court's possible conflict with defense position).[6]

With these principles in mind, we turn to the case at hand.

### III.

■ In its written order, filed two weeks after declaring the mistrial, the court below explained that this decision was "premised" on the fact that "from the trial's inception" defense counsel represented that Sloan would testify. The district court stated that it "relied upon such representations in its rulings or evidentiary issues in both the government's and the defendant's cases-in-chief, admitting evidence presumed to be corroborative of defendant's anticipated testimony." It also noted that the prosecutor's failure to object to certain testimony evidenced the government's similar reliance on these defense representations. The court did not suggest that defense counsel intentionally misrepresented the situation when asserting Sloan would testify. (Nor does the government make this claim.) Indeed, in denying the post-trial defense motion for recusal, the court specifically stated that "*it has never been suggested that the change in trial strategy* [Sloan's ultimate decision not to testify] *was a premeditated ploy,* or that this court in any way finds fault in defense counsel's zealous representation of their client." (emphasis added).[7] Nonetheless, the court concluded

---

6. The dissent concludes that in this case the public's interest outweighs the defendant's rights, noting that this is "especially" so because "the declaration of mistrial has not been shown to have prejudiced the defendant or benefited the prosecution." As indicated in text above, *Jorn, Council,* and *Sartori* teach that neither prejudice to the defendant nor benefit to the prosecution is significant to the mistrial determination. The dissent ignores this critical aspect of *Jorn* and completely ignores *Council, Sartori,* and other recent decisions of this Court. *See infra* note 11. In *Gori v. United States,* 367 U.S. 364, 370, 81 S.Ct. 1523, 1527, 6 L.Ed.2d 901 (1961), on which the dissent heavily relies, the Court did conclude that it was "unwilling where it clearly appears that a mistrial has been granted in the sole interest of the defendant to hold that its necessary consequence is to bar all retrial." But ten

years later in *Jorn,* the Supreme Court specifically disavowed this reasoning in *Gori:*

> ... we think that a limitation on the abuse-of-discretion principle based on an appellate court's assessment of which side benefited from the mistrial ruling does not adequately satisfy the policies underpinning the double jeopardy provision. Reprosecution after a mistrial has unnecessarily been declared by the trial court obviously subjects the defendant to the same personal strain and insecurity regardless of the motivation underlying the trial judge's action.

400 U.S. at 453.

7. Thus the trial court did *not* find—and the government did *not* (and does not) assert—that when defense counsel delivered his opening

that reliance—by the court and the prosecutor—on the defense representations that Sloan would testify "rendered the trial fundamentally unfair to the United States" when Sloan ultimately decided not to testify.

The lower court was certainly correct in its finding that there were representations by defense counsel that Sloan would testify. Contrary to the district court's assertions, however, there is simply no evidence that these representations were made from the "trial's inception" or that reliance upon these representations resulted in the admission of "evidence presumed to be corroborative of defendant's anticipated testimony" or in any other way "rendered the trial fundamentally unfair to the United States."

In fact, it was not until the trial was half over and defense counsel was cross-examining the government's eighteenth witness, James Carroll, that the question of whether Sloan would testify was initially raised. When defense counsel attempted to impeach Carroll with his prior bribery conviction to show that Sloan did not want Carroll in the union because of that history of bribes, the court asked for the first time if Sloan was going to testify. After defense counsel stated he was, the court nevertheless precluded defense counsel from impeaching Carroll with the bribery conviction, explaining that when Sloan took the stand he could testify as to whether Carroll's bribery was the reason that he wished to exclude Carroll from the union. Thus, the court expressly *refused* to permit the government's witness to be impeached in expectation of "defendant's anticipated testimony." Shortly thereafter, during cross-examination of Scipio Hawkins, the court refused to permit Hawkins to be impeached by the content of certain grievances and a letter from Sloan, although defense counsel stated that Sloan would testify and Hawkins had admitted knowledge of those documents. Moreover, although the court ruled that Hawkins could be asked to identify the documents, with the understanding that Sloan would testify as to their purpose, in fact, the defense never asked Hawkins to identify the documents. Thus, the representation that Sloan would testify did not affect this portion of the trial in any way.

The remaining two representations by defense counsel as to Sloan's testimony, on which the trial court (in its recusal opinion) asserted it relied, took place during the defense case. When defense counsel attempted to question Andrew Canoutas about the reason he prepared a deed of trust for Sloan, the court sustained the government's objection on the grounds of hearsay. Defense counsel argued that Canoutas's answer would merely corroborate Sloan's testimony, but the court continued to sustain the objection because there was "nothing to corroborate ... at this point." Thus, once again the court specifically *refused* to permit testimony "presumed to be corroborative of defendant's anticipated testimony." The last instance cited by the court occurred during the cross-examination of defense witness Buster Smalls, when the government asked to question Smalls about Sloan's filing of a false affidavit. Defense counsel stated that he had another twenty minutes of testimony before calling Sloan and asked the court to recess for the day so that counsel could examine the court's ruling as to the false affidavit. The court agreed to recess, noting that it was inclined to allow the government's questions when the trial resumed. Again, defense counsel's representation as to Sloan's testimony had no effect on the admission of evidence in the trial.

Aside from the four times cited by the lower court, neither the court nor the government refers us to any other occasion where the court ruled or the government objected or failed to object based on the belief that Sloan would testify. We have

---

statement, he knew that Sloan would not testify and so intentionally engaged in a premeditated "course of conduct calculated to necessitate granting of the mistrial." *See McNeal v. Hollowell,* 481 F.2d 1145, 1151 (5th Cir.1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1476, 39 L.Ed.2d 567 (1974). Of course, if this had been the situation, we would be presented with a very

different case. *Id. But see, United States v. Obregon,* 893 F.2d 1307, 1310 (11th Cir.) (although prosecutor in opening statement "referred to testimony which he had no intention of presenting at trial" a mistrial was not required), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990).

carefully examined the entire transcript and have found no such occasions.[8] Accordingly, there is simply no support in the record for the district court's finding that reliance on defense counsel's representations that Sloan would testify caused it to make evidentiary rulings and the government to make or fail to make objections, which rendered the trial fundamentally unfair to the United States when Sloan ultimately decided not to testify. In other words, no reason, let alone a manifest necessity, is apparent in the record to justify a mistrial on the ground set forth by the court. The government implicitly concedes as much by failing to assert that its objections, or failure to object, to any evidence were made in reliance on the defense representations that Sloan would testify. Indeed, in its appellate brief the government does not mention even one of the occasions on which defense counsel expressly assured the court that Sloan would testify, let alone assert that prejudice arose from the defense assurances.

■ Instead, the government argues that the declaration of a mistrial was justified by the portion of the defense opening statement that contained the "Horatio Alger-like" account of Sloan's life. In support of that argument, the government asserts that it "believes" that "[i]n his [the trial judge's] order and reference to certain failure[s] to object, the court is referring to the opening statement more than the various witnesses cited by the appellant." A close reading of the court's orders indicates nothing of the kind. In its written order, explaining its reasons for granting the mistrial, the court never mentioned defense counsel's opening statement. Rather, the court cited its "rulings upon *evidentiary issues* in both the Government's and the defendant's *cases-in-chief, admitting evidence* presumed to be corroborative of defendant's anticipated testimony" and stated that "[i]mplicit in the United States Attorney's response, or lack thereof, to defense counsel's *questions to witnesses and their answers* was the former's reliance in the same regard, i.e., his failure to object to certain *questions and answers during cross examination* was evidence of his reliance on defense counsel's representations." (emphasis added). Similarly, in its order denying the defense motion to recuse, although the court reiterates its reliance on defense counsel's assurances that Sloan would testify in making evidentiary rulings, and quotes four such assurances, the court never mentions defense counsel's opening statement.

Although it is not at all clear that we need address a ground apparently not relied on, or even considered by, the district court in declaring the mistrial, we shall do so. The core government claim is that, while concededly not improper when given, the defense opening statement necessitated a mistrial "when the defense was unable to produce the testimony via the defendant to support the Horatio Alger-like statements made to the jury." The only precedent cited by the government for this argument is *Arizona v. Washington,* 434 U.S. at 511–14, 98 S.Ct. at 833–35.

It is true that in *Washington* a defense opening statement formed the basis for the declaration of a mistrial, but that opening statement referred to inadmissible, "improper and highly prejudicial evidence." *Id.* at 515, 98 S.Ct. at 835. Specifically, defense counsel "explicitly stated that they [the jurors] would hear testimony showing that the Supreme Court of Arizona granted [the defendant] a new trial because the prosecutor deliberately withheld exculpatory evidence from the defense." *Id.* at 514 n. 34, 98 S.Ct. at 835 n. 34. Immediately after this statement, the prosecutor moved for a mistrial. *Id.* at 499, 98 S.Ct. at 827. During argument on the motion, the trial judge "expressed the opinion that evidence concerning the reasons for the new trial" was inadmissible. *Id.* However, the court, evidencing its refusal to act "precipitately," gave defense counsel the opportunity to "find ... some written law" to

---

8. Indeed, the only other time (which is cited by neither the court nor the parties) in which defense counsel stated that Sloan would testify occurred earlier in Canoutas's testimony when the government initially raised the issue of impeaching witnesses with questions about the false affidavit filed by Sloan. *See supra,* part I. The court did not allow the impeachment of Canoutas, not because of any reliance on Sloan's testimony but because Canoutas had been sanctioned for filing the affidavit without any investigation, rather than for filing a false affidavit.

support his position to the contrary. *Id.* at 514 n. 34, 98 S.Ct. at 835 n. 34. The next day, the prosecutor renewed his mistrial motion arguing that the evidence was clearly inadmissible, and that the prejudice suffered by mentioning it to the jury "could not be repaired by any cautionary instructions, and that a mistrial was a 'manifest necessity.'" *Id.* at 500, 98 S.Ct. at 827. The trial court permitted an "extended argument," *id.* at 501, 98 S.Ct. at 828, thus affording the parties a "full opportunity to explain their positions" and demonstrating the court's "concern for the double jeopardy interests implicated by an improvident mistrial." *Id.* at 514 n. 34 & 515, 98 S.Ct. at 835 n. 34 & 835. Defense counsel still failed to offer any supporting precedent, and so the court granted the motion for mistrial.

Here, in contrast, the trial court did not evidence its refusal to act in haste by providing defense counsel an opportunity to "find ... some ... law" to support his position. There was a one hour chambers conference, not an "extended argument" affording the parties a "full opportunity to explain their positions" and demonstrating the court's concern for the constitutional rights "implicated by an improvident mistrial." Furthermore, there was little indication that court or counsel considered the alternative of a curative instruction.[9] Moreover, unlike the evidence of prosecutorial misconduct referred to in the opening statement in *Washington,* none of the evidence referred to in the "Horatio Alger-like" statement was inadmissible or "highly prejudicial." Indeed, the government concedes that the statement here, unlike that in *Washington,* was not "*per se* objectionable." For these reasons, *Washington* provides little support for the government's position.

Moreover, what the government totally ignores in asserting that the defense opening statement made mistrial a necessity when Sloan failed to testify is the well established principle that when "an opening statement is an objective summary of evidence [counsel] reasonably expects to produce, *a subsequent failure in proof will not necessarily result in a mistrial.*" *United States v. Wright–Barker,* 784 F.2d 161, 175 (3d Cir. 1986) (emphasis added) (no error in denial of defendants' motion for a mistrial where in opening statement government discussed prior acts of defendants but court later decided that that evidence was not admissible and defendants did not object or request a curative instruction); *see also Obregon,* 893 F.2d at 1310–11 (although prosecutor never intended to call witness whose testimony he referred to in opening statement, in view of cautionary instructions, mistrial was not required); *Mares v. United States,* 409 F.2d 1083, 1085 (10th Cir.1968) (the "law does not require that opening trial statements be completely supported by evidence introduced during the trial"), *cert. denied,* 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969).

As the Supreme Court explained twenty-five years ago:

It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. Many things might happen during the course of a trial which would prevent the presentation of all the evidence described in advance.[10] Certainly not every

---

9. The only suggestion that the court considered such alternatives is the government's assertion in its response to the defense post-mistrial affidavit that the court considered correcting the opening statement but decided that it "could not unscramble the eggs." Neither this comment, nor anything like it appears in any transcript. Sloan does not recall that this comment was made. In any event, the prosecutor's unsworn statement as to this casual remark does not provide much assurance that the court in fact carefully considered less drastic alternatives to a mistrial.

10. A defendant's decision not to testify is one that can come at any time in a trial. *See Brooks v. Tennessee,* 406 U.S. 605, 609–10, 92 S.Ct. 1891, 1893–94, 32 L.Ed.2d 358 (1972). In *Brooks,* the Supreme Court held that a statute requiring a defendant to testify before any other defense witnesses violated the defendant's "unconditional right not to take the stand," explaining:

Although a defendant will usually have some idea of the strength of his evidence, he cannot be absolutely certain that his witnesses will testify as expected or that they will be effective

variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given.... [I]t does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial. At least where the anticipated, and unproduced, evidence is not touted to the jury as a crucial part of the prosecution's case, "it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately."

*Frazier v. Cupp*, 394 U.S. 731, 736, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969) (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 239, 60 S.Ct. 811, 852, 84 L.Ed. 1129 (1940)).

An examination of the facts of *Frazier* and *United States v. Shaw*, 829 F.2d 714 (9th Cir.1987), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988), is helpful. In *Frazier*, the prosecution's opening statement contained a summary of the testimony expected from a co-defendant who had already pled guilty. 394 U.S. at 733, 89 S.Ct. at 1421–22. When the co-defendant later refused to testify, the defendant moved for a mistrial, which was denied. *Id.* at 734, 89 S.Ct. at 1422. On appeal, the defendant argued that the opening statement added weight to the prosecution's argument without affording the defense any opportunity to cross-examine, thereby violating the defendant's confrontation rights. *Id.* The Supreme Court rejected the argument, because the prosecutor could "reasonably expect" the co-defendant to testify as described in the opening statement, the expected testimony was not a "vitally important part" of the government's case, the court had instructed the jury that opening statements were not evidence, and defense counsel requested no

additional instruction. *Id.* at 735–37, 89 S.Ct. at 1422–24. In contrast, in *Shaw*, doubt arose *before* opening statements as to whether a "key" prosecution witness would testify in the defendant's trial for possession of a weapon and so the trial court clearly instructed counsel not to discuss any facts that could only be established by that witness's testimony. 829 F.2d at 718–19. Nevertheless, defense counsel repeatedly stated that the "key" witness had admitted to an investigator that the weapon in question "belonged to her ... was in her possession," not in the defendant's. *Id.* at 719. When the "key" witness, although immunized, refused to testify and it was "clear from the record" that the court considered a curative instruction and concluded it "could not cure the prejudice to the government's case," there was held to be manifest necessity justifying the declaration of mistrial. *Id.* at 720.

■ Several principles emerge from examination of *Frazier* and *Shaw*. First, even if an opening statement is as prejudicial as that in *Shaw*, a trial court should, as the *Shaw* (and *Frazier*) court did, explore alternatives to a mistrial. *See also* Fed.R.Crim.P. 26.3. When this has been done, there will be some cases involving extreme circumstances, like those in *Shaw*, in which the prejudice caused by an opening statement cannot be cured by any remedy short of a mistrial. On the other hand, in less egregious circumstances, like those in *Frazier*, it will be clear that there are less drastic alternatives and that a mistrial is not necessary. Thus, even if the "Horatio Alger-like" statement had been the basis for the lower court's declaration of the mistrial (and there is no indication that it was) the court had an obligation to consider alternatives prior to declaring a mistrial. As explained within, unlike the trial courts in *Shaw* and *Frazier*, there is scant evidence in the present case that the district court fulfilled this obligation.

on the stand. They may collapse under skillful and persistent cross examination, and through no fault of their own may fail to impress the jury as honest and reliable witnesses.... Because of these uncertainties, a defendant may not know at the close of the State's case whether his own testimony will be necessary or even helpful to his cause....

*Id.* at 609–10, 92 S.Ct. at 1893–94. We do not here hold that a defendant's Fifth Amendment rights are violated when a mistrial is declared simply because the defendant, whose counsel asserts he will testify and who in good faith planned to testify, decides not to do so. However, we do note our concern that such a situation might well implicate those rights.

If the court below had explored alternatives, it would have had to recognize that declaration of a mistrial was unnecessary.[11] The opening statement here was not the sort of highly improper, noncorrectable statement at issue in *Shaw*. Rather, it is even more innocuous than the *Frazier* statement. Furthermore, here, like *Frazier* and unlike *Shaw*, there was no suggestion prior to the opening statement that the witness (Sloan) would not testify, no admonishment from the court that opening statements could not refer to facts provable only by the witness's testimony, and no indication that the witness was considered "key" by either the defense or the government. Moreover, while in *Shaw* the opening statement recounted that the "key" witness would testify to a crucial piece of evidence, and while in *Frazier* counsel outlined damaging testimony, here counsel only summarized some events in Sloan's life. This summary did not contain any crucial piece of evidence; indeed, defense counsel did not even state that Sloan himself would testify, let alone what that testimony would be. Thus, the statement objected to here truly was no more than an "objective summary of evidence [counsel] reasonably expect[ed] to produce." *Wright–Barker*, 784 F.2d at 175. A mistrial was simply not necessary—let alone manifestly necessary—here. The jury instruction already given, *i.e.*, that opening statements are not evidence, perhaps supplemented by an instruction that the jury not consider statements made by counsel as to Sloan's life, would have been sufficient to cure any prejudice caused by Sloan's decision not to testify.

We recognize that in refusing to dismiss the indictment on double jeopardy grounds, the trial court noted that the transcript did not reflect off-the-record comments, "the silence of the court or counsel," or the "court's unspoken thought processes."

Obviously, this is true. Moreover, as explained above, we are cognizant of the deference to be given a trial court when it exercises its discretion in declaring a mistrial. "But that discretion must still be exercised," *Jorn*, 400 U.S. at 485, 91 S.Ct. at 557, and "reviewing courts have *an obligation to satisfy themselves* that ... the trial judge exercised 'sound discretion' in declaring a mistrial." *Washington*, 434 U.S. at 514, 98 S.Ct. at 835. (emphasis added). The only way an appellate court can determine if discretion has been exercised is by close examination of the record.

Although the trial court need not make an explicit finding of manifest necessity or expressly set forth what alternatives to a mistrial it has considered, *Washington*, 434 U.S. at 517, 98 S.Ct. at 836, the record must at least support an "implicit finding of 'manifest necessity[,]' ... especially ... when the trial judge makes a *sua sponte* ruling over the defendant's objection." *United States v. Sanders*, 591 F.2d 1293, 1299 (9th Cir.1979). *Accord United States v. Bates*, 917 F.2d 388, 397, n. 12 (9th Cir.1990). *See also Washington*, 434 U.S. at 517, 98 S.Ct. at 836 ("the record must provide justification" for the declaration of a mistrial). "[S]peculation ... cannot serve as a basis for manifest necessity." *United States v. Allen*, 984 F.2d 940, 942 (8th Cir.1993). Thus, "[e]ven if the trial judge believes in subjective good faith that a mistrial is called for," an appellate court "must reverse if the record belies his concerns." *United States v. Meza–Soria*, 935 F.2d 166, 171 (9th Cir.1991). As the Supreme Court has explained, when "the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for deference [to his discretion] by an appellate court disappears."

---

11. The thoughtful dissenting opinion seems to recognize that there were indeed alternatives to mistrial here. In view of this recognition, reversal would appear to be required under controlling Fourth Circuit precedent. *See United States v. Shafer*, 987 F.2d at 1057–1058 ("In order to determine if the mistrial was required the critical inquiry is whether less drastic alternatives were available"; after determining that there were such alternatives, we held the "district court abused its discretion by not allowing [the defendant] an opportunity to accept these alternatives."); *Harris v. Young*, 607 F.2d at 1085 n. 4 (Chief Judge Haynsworth) ("If obvious and adequate alternatives to aborting a mistrial were disregarded, this suggests the trial judge acted unjustifiably"; after concluding that there were such alternatives, we held the declaration of mistrial to be an abuse of discretion).

*Washington,* 434 U.S. at 510 n. 28, 98 S.Ct. at 832 n. 28.

Here we have carefully, indeed painstakingly, examined the record. There is simply nothing in it to support even an "implicit finding of 'manifest necessity'." *See Sanders,* 591 F.2d at 1299. We have no doubt that the trial judge did act in "subjective good faith." *See Meza-Soria,* 935 F.2d at 171. However, the "record belies" *id.,* the court's stated concerns that reliance on defense counsel's representations that Sloan would testify caused it to rule and defense counsel to act in such a way as to "render[ ] the trial fundamentally unfair to the United States." Rather, the record reveals that appropriate jury instructions provided a clear and simple alternative to mistrial, and so there was no manifest necessity justifying it. We cannot conclude that the trial court properly exercised its discretion in declaring the mistrial.[12]

### IV.

There was no manifest necessity for the district court's *sua sponte* declaration of a mistrial over Sloan's objections. Thus, when the government sought to retry Sloan, his motion to dismiss the indictment on double jeopardy grounds should have been granted. The trial court's order to the contrary must be reversed. Sloan cannot be further prosecuted on the charges involved in this appeal.

*REVERSED.*

### APPENDIX

The evidence will show you, ladies and gentlemen, that Willie Sloan, and this is important, because again you are to judge the credibility of this evidence and the credibility of this man and his history with the union. The evidence will show that Willie Sloan was born in Leland, North Carolina. He's one of your neighbors. On December 3rd, 1942. He just had a birthday. And even though he

suffered from learning disabilities as a child, he graduated from Lincoln High School at the age of 16. After that, he cleaned fish and delivered furniture and went to New Jersey and Philadelphia as a little boy looking for a job. He couldn't find one, and on his 18th birthday he volunteered for the draft and he entered the army as an infantryman, serving his country and being honorably discharged.

After having been honorably discharged, he went back north and found a job with Sikorsky Helicopters, the largest helicopter manufacturers of the United States, and he sorted mail part time. And while he was there, he married his wife, Mary, who had been his childhood sweetheart. And she came up there to live with him and she became pregnant with their first child.

About the same time, she was a beautician and Willie wanted to be a barber and he wanted to go to barber school. But she got pregnant and he couldn't. And about that time his mama got sick with an aneurysm, and he came back home to take care of his mama. She died 17 days later, and his grandmother asked him to stay and he stayed.

Now, when Willie Sloan found himself back in Wilmington, this is where the historical similarity comes in, ladies and gentlemen, it was right at the beginning of the height of the Vietnam War. And there was a whole lot of munitions and a whole lot of cargo going out of the Port of Wilmington for that war. And Willie Sloan was able to get a job on the waterfront because there were so many jobs to be had. And you remember that when we talk about Desert Storm, which is what fostered the whole reason we're here today, and the similarities.

So Willie got a job handling cargo. Now, back in 1963–64, we didn't have all this automation, and all this palletizing, and all these

**12.** Sloan also urges us to reverse on the theory that the trial court's purpose in declaring a mistrial was to assist the government. *See Shafer,* 987 F.2d at 1058–59; *Whitfield v. Warden of Md. House of Correction,* 486 F.2d 1118, 1123 (4th Cir.1973), *cert. denied,* 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 116 (1974). The United States counters that this was obviously not the court's motive because the government's case was "strong" and "getting stronger." The prosecu-

tion's voluntary dismissal of five counts and the concerns voiced by the court as to four others, *see supra* n. 1, hardly indicate that the government's case was gaining in strength. However, in view of the fact that the trial court's declaration of the mistrial was indisputably triggered by Sloan's late, albeit good faith and unpremeditated, decision not to testify, it seems inappropriate to base a holding on the sort of analysis followed in *Shafer.*

forklifts. People worked with their hands and they worked hard. And Willie Sloan learned to work hard, and he applied, as did 125 other people, who were not union members but came in to work on the docks to help our country and to help their families during the Vietnam War, he applied for membership in Local 1426. And he was qualified. And he and these other men were taken into the union where they were qualified to take into the union, and they went to meetings from January until September, and the people in the union wouldn't allow them to come in. They didn't want to share the work. But they persisted, and finally, the international union—and ladies and gentlemen, the way this union works is there's an international union, there are district unions and then there are local unions, and the international union had to send three international vice presidents down here to swear the new members in because the membership down here didn't want to share the wealth.

And the evidence will show you that Willie Sloan never forgot that, and he was finally allowed in around September of that year, right before another vote for a president, just like this situation. History repeating itself.

During the period of time when Willie Sloan was working, his grandmama helped him get a small piece of land, you'll find. And when he was working, he would work from Monday till Friday. And he'd get his paycheck on Friday, and after they paid bills he would go and he would get as much building material as he could and he started building a house with his own hands. It took him three years to build that 1,400 foot square house that he lives in today and he has had five children and raised five children by the same woman, Mary, who was his boyhood sweetheart, in that same house. I don't know, ladies and gentlemen, what you can draw from your common sense about that type of experience, but please feel free to.

As Willie worked on the waterfront, he worked and he started being sent, he was recognized, the evidence will show, as a talented man, a hard-working man, a smart man. The union sent him to seminars. The union sent him to meetings. The union sent him to conventions. And in 1976 the union membership put him up to be vice president, and he was elected vice president of the union. The business manager got sick and he took over the business manager's job as well for a short period of time, and they realized how important that position was, and the vice president's position was, and they took the vice president off the dock and put him in the union. Three years later, Willie was asked by the membership to run and did run for the office of president, and he was elected to the office of president.

Willie was particularly, the evidence will show you, ladies and gentlemen, particularly adept and particularly in a position to know how to be the head of an organization because he had been elected twice by the people of Brunswick County as their county commissioner, both in 1974 and 1976. The evidence will show you that this man's life has been an open book to the public for a long time. He chose not to run in 1978, because he didn't want it to conflict with his job as an officer of the union.

Now, ladies and gentlemen, Mr. McCullough spoke briefly about the office of the president. The evidence will show you that the office of the president of the union is an extremely critical office. It negotiates all contracts for the union. It oversees all of its pension and welfare funds, which are enormous. The president serves on all the necessary boards of directors. He negotiates and works with the district office which goes all the way around, I believe, from Texas, maybe there's a Gulf district. He chairs all board and membership meetings. He's responsible for all the other aspects of the union. In fact, Willie Sloan is so well thought of that he negotiates contracts for the other local unions in North Carolina.

NIEMEYER, Circuit Judge, dissenting.

When the defendant, Willie Sloan, elected not to testify at trial, having earlier and repeatedly during the course of trial advised the district court that he *would* testify, the district court on its own motion declared a mistrial. As grounds for its motion, the dis-

trict court stated in its order of December 28, 1993:

> [F]rom the trial's inception, defense counsel on several occasions unequivocally asserted to both the court and to the United States Attorney that the defendant would testify on his own behalf. The court relied upon such representations in its rulings upon evidentiary issues in both the Government's and the defendant's cases-in-chief, admitting evidence presumed to be corroborative of defendant's anticipated testimony.
>
> \*   \*   \*   \*   \*   \*
>
> In the court's view, reliance upon defense counsel's unequivocal assertion that defendant would testify rendered the trial fundamentally unfair to the United States.
>
> \*   \*   \*   \*   \*   \*
>
> The court having found the quest for truth to have been fundamentally flawed, a mistrial was declared, and it is so ordered.

After the mistrial was declared, the defendant filed a motion to dismiss the indictment on grounds that a retrial would violate the Double Jeopardy Clause of the Fifth Amendment. In denying the motion, the district court stated:

> The court deems it unnecessary again to address the bases of the defendant's Memorandum, but observes that a trial transcript will not reflect comments made in chambers or off the record, or the silence of the court or counsel in reliance thereon. Nor will a transcript reflect the court's unspoken thought processes in presiding over a trial and in ruling on matters arising therein. The cold record cannot convey many nuances of a criminal trial or the dynamics of human interaction throughout the various proceedings.\*

From the district court's order denying the motion to dismiss the indictment, this appeal followed, and for the reasons stated below, I would affirm.

The double jeopardy protection granted by the Fifth Amendment prohibits a second trial "for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978). The Court explained, however, that a retrial *because of trial error* does not violate the Double Jeopardy Clause:

> In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant.

*Id.* at 15, 98 S.Ct. at 2149. *See also Lockhart v. Nelson,* 488 U.S. 33, 40, 109 S.Ct. 285, 290–91, 102 L.Ed.2d 265 (1988). The Court has stated that the protection against affording

---

\* The majority opinion reveals a thorough review of the trial record and reports the representations made by defense counsel about Sloan's testifying as well as responses by the court and the government. While the majority opinion presumes that the "trial judge acted in 'subjective good faith,'" it concludes that the record belies the court's concerns leading to the declaration of a mistrial. While I cannot take issue with the matters quoted from the record, I would disagree with the characterization. I only note that in addition to the passages discussed in the majority opinion, the opening statement focused the trial from the outset on Sloan's credibility and intent to testify:

> The evidence will show you, ladies and gentlemen, that Willie Sloan, and this is important, because again you are to judge the credibility of this evidence *and the credibility of this man* and his history with the union.
>
> \*   \*   \*   \*   \*   \*
>
> [The local union] didn't want to share the work.... [T]he international union had to send three international vice presidents down here to swear the new members in because the membership down here didn't want to share the wealth.
>
> And the evidence will show you that *Willie Sloan never forgot that* ....

(Emphasis added). These statements are part of a longer story outlined by defense counsel about how Sloan came from most modest beginnings to his success as union president, relying on his thoughts and personal credibility to support the many statements about his success story. While some of the matters could have been testified to by third persons, it was apparent that the promise to the court and jury was that Sloan would take the stand. Although Sloan was free to change his mind, the district court rightly could have concluded that because of his change in position, the structure of the trial had become such that the case could not thereafter be presented fairly to the jury, even in the absence of bad faith on the part of the litigants.

the prosecution a second opportunity to supply evidence which it failed to present initially lies "at the core of the [Double Jeopardy] Clause's protections." *Tibbs v. Florida*, 457 U.S. 31, 41, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982).

Beyond circumstances where the defendant has been acquitted or might have been acquitted because of an inadequacy of the government's evidence, the Supreme Court has been reluctant to deny the opportunity for a second trial and has generally left the decision in such circumstances to the "broad discretion" of the trial judge. *See Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973); *see also Arizona v. Washington*, 434 U.S. at 514, 98 S.Ct. at 835 (requiring trial judges to exercise "sound discretion"). This is so even if the trial judge has granted a new trial too hastily or for reasons that were not entirely clear. *See Gori v. United States*, 367 U.S. 364, 366, 81 S.Ct. 1523, 1525, 6 L.Ed.2d 901 (1961). In *Gori*, in commenting about the trial judge's declaration of a mistrial *sua sponte* during the direct examination of the government's fourth witness, the Supreme Court observed, "It is unclear what reasons caused the court to take this action, which the Court of Appeals characterized as 'overassiduous' and criticized as premature." *Id.* at 365–66, 81 S.Ct. at 1524–25. Nevertheless, in affirming the retrial of the defendant, the Court stated:

> Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.... [W]e have consistently declined to scrutinize with sharp surveillance the exercise of that discretion.

*Id.* at 368, 81 S.Ct. at 1526. The Court did note that the trial court's discretion may be abused if the court declares a mistrial to help the prosecution at a trial in which "its case is going badly, by affording it another, more favorable opportunity to convict the accused." *Id.* at 369, 81 S.Ct. at 1526–27. But this observation merely amounts to a varia-

tion on the critical theme that double jeopardy prohibits a retrial to cure an inadequacy of the government's evidence in the first trial. As the Court in *Arizona v. Washington* summarized:

> "[The Double Jeopardy Clause] bars retrials where 'bad-faith conduct by judge or prosecutor' ... threatens the '[h]arrassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant."

434 U.S. 497, 508, 98 S.Ct. 824, 831–32, 54 L.Ed.2d 717 (1978) (quoting *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267). Otherwise, the district court's judgment is entitled to "great deference," *id.* 434 U.S. at 514, 98 S.Ct. at 835, and must be accorded "the highest degree of respect," *id.* at 511, 98 S.Ct. at 833.

Thus the double jeopardy prohibitions against retrial fall into two categories: (1) an absolute protection, where the defendant has been acquitted (or convicted) or would have been acquitted had the case gone to judgment, and (2) a discretionary grant of protection, at issue here, where the trial is aborted because of trial error or some other event tending to defeat the ends of public justice. In reviewing cases in the second category, the Supreme Court continues to return to the fountainhead statement of Justice Story in *United States v. Perez*, 9 Wheat. 579, 580, 6 L.Ed. 165 (1824):

> [I]n all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.

The *Perez* formulation, however, does not set forth a test to be rigidly or mechanically applied. *See Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. at 830–31. And the public interest in "fair trials designed to end in just judgments" is not to be undermined casually. *See id.* at 516, 98 S.Ct. at 836.

The discretion given to trial judges, accordingly, is necessarily broad in light of the "compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation," *id.* at 513, 98 S.Ct. at 834, and therefore our review can only be for its abuse. As the Court in *Arizona v. Washington* noted, the Double Jeopardy Clause recognizes society's interest in "giving the prosecution one complete opportunity to convict those who have violated its laws." *Id.* at 509, 98 S.Ct. at 832. This is the end of public justice which must not be forsaken readily.

> The interests of the public in seeing that a criminal prosecution proceed to verdict, either of acquittal or conviction, need not be forsaken by the formulation or application of rigid rules that necessarily preclude the vindication of that interest.

*Illinois v. Somerville*, 410 U.S. at 463, 93 S.Ct. at 1070.

In this case, the district court declared a mistrial on its own motion because of a perceived injustice in the proceedings. Even though the government was denied a complete opportunity to convict, and the defendant was denied the opportunity for obtaining an acquittal, no evidence appears that the district court abused its discretion. The court believed, and so expressed the belief which we have no reason to doubt, that because of matters that appear both on and off the record, the "quest for truth [became] fundamentally flawed." The court did not attribute fault to the defendant's abrupt decision not to testify, but did recognize that the change of stance undermined the trial's structural assumption that the defendant would testify. This structure took shape right from the beginning in the defendant's opening statement. Because we can now evaluate specific rulings and exchanges from a written record which was unavailable to the district court, we might be inclined to question the wisdom of the district court's order based on the bare record, particularly when the judge failed to explore other possibilities for saving the trial. But such speculation does not require us to find that the district court abused its broad discretion. Indeed, nothing in the record points to the conclusion

that the district judge acted "irrationally or irresponsibly," *Arizona v. Washington*, 434 U.S. at 514, 98 S.Ct. at 835, or in such a manner as to cast doubt upon the exercise of his broad discretion.

In furtherance of the *Perez* formulation, public justice demands that the government be given the opportunity to complete a prosecution, unless its own actions preclude such an opportunity and as long as a district court did not act in bad faith or otherwise abuse its discretion. We should not act to deny the public its right to prosecute fully and fairly those persons accused of felonies.

The majority opinion reveals an admirably thorough effort in having combed the record for actual reliance and prejudice, finding little that could not have been corrected by an instruction to the jury or a renewed opportunity to one side or the other to present witnesses. While those alternatives may become apparent under the closer scrutiny of the record made possible at the appellate level, the record is not without support for the district court's concerns. The conduct of the trial placed the credibility of Sloan squarely before the jury, and various exchanges during trial, outlined by the majority opinion, continued to rely on Sloan taking the stand. In addition to explicit statements of reliance on Sloan's expressed intention to testify and to the direction the trial took based on that assumption, we note that the district court also observed that it often remained silent in reliance on these statements, something that the trial transcript cannot reveal. All of these matters, express and implied, point to an effort by the district court to obtain a just trial and not to favor one side or the other. *Cf. United States v. Jorn*, 400 U.S. 470, 483, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971). I do not believe that the task undertaken by the majority to find irremediable prejudice is the appropriate standard of review.

In short, while I am prepared to acknowledge that from the bare record, it would appear that a greater exploration of ways to save the trial could have been undertaken, I cannot conclude that the mistrial declared by the district court was irrational or an abuse of discretion, which is the applicable standard

of review.  In the absence of clear evidence of abuse, I would find that "the public's interest in fair trials designed to end in just judgments" outweighs, in this case, the defendant's right to have his trial concluded before the first jury impaneled or to be free from the harassment of a second trial, *see Arizona v. Washington,* 434 U.S. at 516, 98 S.Ct. at 836, especially where, as here, the declaration of mistrial has not been shown to have prejudiced the defendant or benefited the prosecution.

Accordingly, I respectfully dissent.