PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UUNO MATTIAS BAUM,

       *Petitioner-Appellant,*

v.

COLLIE RUSHTON, Warden,
McCormick Correctional
Institution,

       *Respondent-Appellee.*

No. 07-7589

Appeal from the United States District Court
for the District of South Carolina, at Beaufort.
Margaret B. Seymour, District Judge.
(9:06-cv-02471-MBS)

Argued: January 28, 2009

Decided: July 16, 2009

Before WILKINSON, KING, and GREGORY,
Circuit Judges.

Affirmed by published opinion. Judge King wrote the majority opinion, in which Judge Wilkinson joined. Judge Gregory wrote a dissenting opinion.

## COUNSEL

**ARGUED:** John Henry Blume, III, BLUME, WEYBLE & NORRIS, L.L.C., Columbia, South Carolina, for Appellant.

Melody Jane Brown, OFFICE OF THE ATTORNEY GEN-
ERAL OF SOUTH CAROLINA, Columbia, South Carolina,
for Appellee. **ON BRIEF**: Henry D. McMaster, Attorney
General, John W. McIntosh, Chief Deputy Attorney General,
Donald J. Zelenka, Assistant Deputy Attorney General,
OFFICE OF THE ATTORNEY GENERAL OF SOUTH
CAROLINA, Columbia, South Carolina, for Appellee.

---

## OPINION

KING, Circuit Judge:

Uuno Mattias "Matt" Baum appeals from the district
court's Opinion and Order of September 2007, dismissing his
28 U.S.C. § 2254 petition for habeas corpus relief. *See Baum
v. Rushton*, No. 9:06-cv-02471 (D.S.C. Sept. 30, 2007) (the
"District Court Opinion").[1] In January 2001, Baum was con-
victed in the Court of General Sessions for Pickens County,
South Carolina, of the murder of his stepfather, Randall Pin-
ion. Baum had previously been brought to trial for the Pinion
murder in October 2000, but, early in that trial's second day,
the trial judge declared a mistrial after learning that Pinion's
body had just been discovered. On direct appeal, the Court of
Appeals of South Carolina rejected Baum's contention that
the discovery of the body did not constitute "manifest neces-
sity" for the mistrial and, thus, that his subsequent conviction
was obtained in contravention of the Double Jeopardy Clause
of the Fifth Amendment. *See State v. Baum*, 584 S.E.2d 419
(S.C. Ct. App. 2003) (the "State Decision"). After exhausting
his double jeopardy claim in the South Carolina state courts,
Baum pursued such claim in these habeas corpus proceedings.
As explained below, we affirm the district court's denial of
relief.

---

[1]The District Court Opinion is found at J.A. 329-42. (Citations herein
to "J.A. ___" refer to the contents of the Joint Appendix filed by the par-
ties in this appeal.)

## I.

### A.

The Court of Appeals of South Carolina, in the State Decision disposing of Baum's direct appeal, outlined the facts surrounding the Pinion murder as follows:

> On October 26, 1999, Randall Pinion went to his bank and filled out an affidavit of forgery concerning two checks in the amount of $450.00 apiece and made out to Matt Baum. The bank employee who assisted Pinion gave him the original affidavit of forgery and instructed him to take it to the police if he desired to prosecute. On October 27, 1999, two days prior to Pinion's disappearance, he arrived at work upset and told a co-worker that Matt Baum, Pinion's stepson, had stolen some money from him. Pinion told the co-worker he would give Baum two days to repay the money or he was going to turn Baum in to the police. On the morning of his disappearance, Pinion stated to the co-worker that he was giving Baum until that evening to give him his money. Pinion never filed a police report in regard to the alleged forgeries. Two weeks earlier, Baum threatened to kill Pinion after Pinion had physically abused Baum's mother.

> On Friday, October 29, 1999, Pinion disappeared after leaving work. His black pickup truck was not at his [Easley, South Carolina] home on Friday night or Saturday morning, but appeared at his house between 3:00 and 11:00 p.m. on Saturday, October 30. Between 4:00 and 7:00 p.m. on Sunday[,] October 31, the truck again disappeared from the house. Pinion's truck was subsequently found in a church parking lot a few days later.

On November 1, 1999, Baum sold a set of Taylor Made golf clubs to a sporting goods store, explaining they belonged to his stepfather, who had passed away and left him the clubs. Pinion owned several sets of golf clubs, including a Taylor Made set.

Police investigated Pinion's home and pickup truck and found Pinion's blood in various places throughout his home, as well as in the bed of his pickup truck. The police also found a bloody shoe print inside Pinion's home. The police concluded that Pinion had been beaten to death inside of his home and someone thereafter attempted to clean up the crime scene.

Based on their investigation, the authorities developed Baum as a suspect in Pinion's disappearance. On November 7, 1999, after receiving a tip on his possible location, police attempted to apprehend Baum as he fled in a white pickup truck. The chase reached speeds of more than 100 miles per hour, and ended when the white truck became disabled following a traffic accident. When the police searched the disabled truck they discovered the keys to Pinion's truck, a couple of Pinion's checks, Baum's driver's license, and a pair of tennis shoes whose tread was consistent with the bloody shoe print found inside Pinion's home.

*State v. Baum*, 584 S.E.2d 419, 420-21 (S.C. Ct. App. 2003).

## B.

Although the police had not located Pinion's body, the grand jury in Pickens County returned an indictment on November 11, 1999, charging Baum with the Pinion murder. Baum's trial began on October 9, 2000, with Judge John W. Kittredge presiding. That day, a Monday, the jury was sworn,

the parties delivered their opening statements, and the prosecution presented three witnesses. At the start of the trial proceedings the following Tuesday morning, the prosecution notified the court and the defense, during an off-the-record conference in the judge's chambers, that it had just learned that a body had been discovered in North Carolina and identified as Pinion's. The prosecution thereafter made a motion in open court (but outside the presence of the jury) for a trial continuance or a mistrial based on the discovery of the victim's body. The prosecution explained that the North Carolina authorities had recovered the body on Saturday, and sent a teletype about the body to the Easley Police Department on Sunday. According to the prosecution, the detectives assigned to the Pinion murder investigation did not learn about the teletype until Monday evening, and a positive identification of the body as Pinion's was not made until Tuesday morning. The identification was made by Pinion's dentist, based on the North Carolina medical examiner's description of distinctive dental work. The prosecution presented the trial judge with an affidavit from the dentist, executed that very morning, verifying Pinion's identification.

The prosecution asserted that a continuance or a mistrial was necessary "to give both sides of this case time to look at what evidence may come forward as a result of" the discovery of Pinion's body. J.A. 42. The prosecution explained:

> Obviously, there may be — we don't know what's going to show up, but there may be evidence exculpating the defendant. And if that's true, he needs to have access to that. Conversely, there may be evidence that inculpates him and shows that he, in fact, is the one who dumped the body. And if that's the case, he should not be allowed to benefit from his attempt at obstructing justice.

> Either way, Your Honor, I am aware that the jury has been sworn. I would ask that Your Honor, if you

are inclined to grant my motion, find that this is for good cause and not as a result of some wrongdoing or anything else in that way of the State, and therefore would not prejudice us by attaching jeopardy to a trial that we've begun.

Your Honor knows that we are here and are prepared to go forward. And it's not any attempt whatsoever to continue this trial. As a matter of fact, I believe myself and the family who are here behind me are as ready as the defendant himself to get this behind us. But this is important evidence that we need to have some time to look at.

*Id.* at 42-43. The defense responded that it was "not joining in [the prosecution's] motion in any way, shape, form or fashion. We are here. We're ready for trial. And we're ready to proceed, Your Honor." *Id.* at 43. Over this objection by the defense, Judge Kittredge declared a mistrial. He explained that,

[b]ased on the level of certainty that this may, indeed, be the remains of Mr. Pinion, . . . a mistrial is warranted for good cause, not the result of anything caused or done, any act or omission by the State. I feel this is a matter of manifest necessity and that jeopardy will continue. Jeopardy does not attach and begin anew in my firm judgment, and I so rule that this is a matter of manifest necessity that potentially could enure to the benefit of the defendant. A key issue in the case was the fact that the body had not been found. This revelation is significant. And if it actually turns out, based on the scientific examination, that this is indeed the remains of Mr. Pinion, then this case should well not continue and be retried at another date.

*Id.* at 43-44. Judge Kittredge then reiterated that "jeopardy will continue" and concluded the proceedings, "subject to the retrial." *Id.* at 44.

On November 8, 2000, Judge Kittredge entered a written Order Declaring Mistrial. *See State v. Baum*, No. 99-GS-39-1276 (S.C. Ct. Gen. Sess. Nov. 8, 2000) (the "Mistrial Order").[2] The judge stated therein the following findings of fact and conclusions of law:

> Based upon everything presented to this court, I hereby find that the discovery of the victim's body almost one year after the date of the alleged murder was in no way a result of any act, omission, negligence, bad faith, or lack of effort on the part of the State. The State has diligently attempted to locate the deceased but had simply been unable to do so. In this regard, it is reasonable to conclude that whomever placed the body of Randall Pinion in the remote area of McDowell County did so to secrete the whereabouts of the deceased and avoid detection. Furthermore, given the fact that the defendant was incarcerated since November 7, 1999, unable to make bond, it was imperative upon the State to proceed to trial without further delay. In fact, there was an order requiring the case to proceed to trial.

> I specifically find that it is of manifest necessity that a mistrial be granted in this case. The potential for exculpatory evidence being located with the body and the disposition site is significant and could potentially benefit or even exonerate the defendant. This Court is aware of the concerns regarding a mistrial in any case and makes its decision after careful review of all the circumstances and the possible alternatives to granting a mistrial.

---

[2]The Mistrial Order is found at J.A. 45-48.

The court is aware of the decision in *Gilliam v. Foster*, 75 F.3d 881 [(4th Cir. 1996) (en banc)], and specifically finds that there was no other alternative available to the court to resolve this matter. It is imperative that the jury charged with deciding this case be given any and all relevant evidence upon which to base their decision. To ignore the opportunity to explore the disposition of the body, which could very likely be exculpatory to the defense, is too great. As stated in *State v. Prince*, the standard for declaring a mistrial depends upon the existence of "manifest necessity or the ends of public justice, the latter being defined as the public's interest in a fair trial designated to end in just judgment." [301 S.E.2d 471, 472 (S.C. 1983)]. *See also Illinois v. Somerville*, 410 U.S. 458 (1973). Furthermore, to suspend the trial of the case and allow the sitting jury to resume the trial approximately two months later would be fundamentally unfair to all concerned (especially Defendant and the jurors) and contrary to the ends of justice.

Having found the existence of manifest necessity for the mistrial, jeopardy continues in this case and the State is not prohibited from retrying this case at a later time.

*Id.* at 2-3 (some internal citations omitted).

On January 22, 2001, Baum's second trial commenced, with Judge Henry F. Floyd presiding. The defense promptly moved for an order, on double jeopardy grounds, barring the State from moving forward with the trial. Judge Floyd denied the defense's motion, observing that "under the existing case law of this state the previous trial judge has tied my hands and I have no authority to override his order." J.A. 65. The trial thereafter proceeded and, on January 24, 2001, the jury found

Baum guilty of murder. Judge Floyd sentenced Baum to life in prison.[3]

Baum appealed to the Court of Appeals of South Carolina, raising his double jeopardy claim. By its State Decision, a three-judge panel unanimously rejected such claim, observing in pertinent part:

> Baum asserts . . . that the State sought a mistrial to simply marshal evidence to strengthen its case against him, and that the grant of a mistrial on such basis is clearly prohibited by the Double Jeopardy Clause. We agree that, as it has evolved in this country, the prohibition against double jeopardy is intended to condemn the practice of the prosecution requesting a mistrial for the sole purpose of buttressing weakness in its evidence, and the strictest of scrutiny is appropriate when the basis for a mistrial is the unavailability of critical prosecution evidence. *Arizona [v. Washington*, 434 U.S. 497, 507-08 (1978)]. However, we do not believe the facts of this case warrant the conclusion that this was the reason behind the granting of the mistrial.
>
> First, we cannot say the body of the victim in this case was *critical* evidence in the prosecution of Baum such that its unavailability triggers the strict scrutiny announced in *Arizona [v. Washington]*. As noted by Baum, the fact that Randall Pinion had been murdered was not in issue. At any rate, we conclude the discovery of the body of a victim during a murder trial, is an extremely important piece of evidence which has just as much potential to exonerate as to inculpate an accused. The judge recognized as

---

[3]As it turns out, Pinion's body — an incomplete skeleton by the time of discovery — served only to prove that Pinion had indeed died, without providing any other useful evidence, either inculpatory or exculpatory.

much, and found that the public's interest in a fair adjudication was implicated by the possibility of discovering exculpatory evidence and giving the jury the benefit of the fully developed facts when deciding the matter. Consequently, we believe manifest necessity was clearly established, and find no abuse of discretion in the trial judge's determination that a mistrial was dictated by such.

*Baum*, 584 S.E.2d at 422. The state court of appeals thereafter denied Baum's petition for rehearing, and the Supreme Court of South Carolina and the Supreme Court of the United States denied Baum's petitions for writs of certiorari.

### C.

In September 2006, Baum filed his 28 U.S.C. § 2254 petition for habeas corpus relief in the District of South Carolina, asserting his double jeopardy claim, which was exhausted in the state courts on direct appeal.[4] The parties filed cross-motions for summary judgment, and the matter was assigned to a magistrate judge. On April 30, 2007, the magistrate judge issued a Report and Recommendation, concluding that the State's summary judgment motion should be granted and Baum's denied. On September 30, 2007, the District Court Opinion was issued, granting the State's summary judgment motion, denying Baum's summary judgment motion, and dismissing the habeas corpus petition with prejudice. On May 5,

---

[4]Notably, prior to filing his habeas corpus petition in the district court, Baum filed a pro se state application for post-conviction relief ("PCR"). In his PCR application, Baum asserted claims of ineffective assistance of counsel, some related to the double jeopardy issue. One such claim was that trial counsel was ineffective in failing to challenge Judge Kittredge's jurisdiction to issue the written Mistrial Order on November 8, 2000, following the expiration of the judge's assignment to Pickens County at the time of the first trial. This and the other ineffective assistance claims raised in Baum's PCR application are not before us in these habeas corpus proceedings.

2008, this Court awarded Baum a certificate of appealability on his double jeopardy claim. We possess jurisdiction over Baum's appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

## II.

We review de novo a district court's denial of habeas corpus relief on the basis of a state court record. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). Because the Court of Appeals of South Carolina adjudicated Baum's double jeopardy claim on the merits on direct appeal, its State Decision is entitled to deference pursuant to the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254(d). AEDPA mandates the use of a two-step analysis to assess whether a habeas corpus petitioner is entitled to relief. Under the first step of the analysis, we may award relief only if (1) the state court adjudication of the issue on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* And, even if error is identified, habeas corpus relief can only be granted, under the second step of the AEDPA analysis, if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). Finally, the state court's factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence. *See* § 2254(e)(1).

## III.

### A.

Under the Double Jeopardy Clause of the Fifth Amendment, no "person [shall] be subject for the same offence to be

twice put in jeopardy of life or limb." U.S. Const. amend. V. The double jeopardy prohibition — "a fundamental ideal in our constitutional heritage" — applies "to the States through the Fourteenth Amendment." *Benton v. Maryland*, 395 U.S. 784, 794 (1969). In the case of a jury trial, jeopardy attaches when a jury is empaneled and sworn. *See Illinois v. Somerville*, 410 U.S. 458, 466 (1973); *Downum v. United States*, 372 U.S. 734, 735-36 (1963). As such, "the constitutional protection [against double jeopardy] embraces the defendant's valued right to have his trial completed by a particular tribunal." *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (internal quotation marks omitted). Writing for the Court in *Arizona v. Washington*, Justice Stevens emphasized that "[t]he reasons why this 'valued right' merits constitutional protection are worthy of repetition," explaining that

> [e]ven if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

*Id.* at 503-05 (footnotes omitted). Nevertheless, "retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused." *Id.* at 505. Rather, the double jeopardy bar may be avoided if the prosecution "demonstrate[s] 'manifest necessity' for any mistrial declared over the objection of the defendant." *Id.*

Justice Story rendered the "classic formulation" of the manifest necessity test in *United States v. Perez*, 22 U.S. (9

Wheat.) 579 (1824). *See Arizona v. Washington*, 434 U.S. at 506. The *Perez* Court ruled that the state trial judge's discharge of the jury over the defendant's objection, because the jury could not agree on a verdict, "constitute[d] no legal bar to a future trial." 22 U.S. (9 Wheat.) at 580. Justice Story articulated that,

> in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office.

*Id.* The *Perez* formulation, as the Court later described it in *Somerville*, "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." 410 U.S. at 462. "Indeed," the Court explained in *Arizona v. Washington*, "it is manifest that the key word 'necessity' cannot be interpreted literally; instead, . . . we assume that there are degrees of necessity and

we require a 'high degree' before concluding that a mistrial is appropriate." 434 U.S. at 506.[5]

The *Arizona v. Washington* Court offered examples of cases that do — and do not — involve a high degree of necessity. The Court observed that "one extreme" is represented by "cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence" — an "abhorrent practice" that "the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn." *Arizona v. Washington*, 434 U.S. at 507-08 (internal quotation marks omitted). As such, the Court instructed that "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Id.* at 508 (footnote omitted); *see also Downum*, 372 U.S. at 737-38 (sustaining double jeopardy plea where mistrial resulted from prosecution's failure to locate and serve subpoena on "essential" witness).

By contrast, the *Arizona v. Washington* Court identified the "other extreme" of cases as those, like *Perez*, involving "the classic basis for a proper mistrial," i.e., "the trial judge's belief that the jury is unable to reach a verdict." *Arizona v. Washington*, 434 U.S. at 509. In such cases, the Court instructed, the trial judge's declaration of a mistrial is to be "accorded great deference by a reviewing court." *Id.* at 510.

---

[5]Importantly, if a defendant agrees to a mistrial, there usually will be no double jeopardy bar to a retrial. As the Supreme Court observed in *United States v. Jorn*, "where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution." 400 U.S. 470, 485 (1971) (plurality opinion). "In the absence of [a defense] motion," however, "the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Id.*

Other cases lie somewhere between these two extremes on the spectrum of necessity, and may (or may not) satisfy the manifest necessity test. *See Downum*, 372 U.S. at 736 (recognizing that "extreme case[ ]" of "[h]arassment of an accused by . . . declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" fails to "mark the limits of the guarantee"); *Wade v. Hunter*, 336 U.S. 684, 691 (1949) (observing that "the guiding principles of the *Perez* decision . . . command courts in considering whether a trial should be terminated without judgment to take all circumstances into account and thereby forbid the mechanical application of an abstract formula" (internal quotation marks omitted)). For instance, while the *Downum* Court determined that jeopardy attached when the mistrial was declared because of the prosecution's failure to locate and serve a subpoena on an "essential" witness, *see* 372 U.S. at 737, the *Wade* Court refused to hold that "the absence of witnesses can never justify discontinuance of a trial," *see* 336 U.S. at 691-92 (concluding that there was no double jeopardy bar to second court-martial where first was dissolved because key witnesses were unavailable due to military necessity).

The *Somerville* Court, though acknowledging that "virtually all of the cases turn on the particular facts and thus escape meaningful categorization," recognized that, generally speaking, "[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." 410 U.S. at 464. The latter circumstance existed in *Somerville*, where the trial judge had declared a mistrial over the defendant's objection after deeming the indictment to be insufficient to charge a crime. *See id.* at 459 (concluding "that the mistrial met the 'manifest necessity' requirement of our cases, since the trial court could reasonably have concluded that the 'ends of public justice' would be defeated by having allowed the trial to continue"). The former circumstance was found in *Arizona v. Washington*, where the trial judge had

declared a mistrial because of improper remarks made by the defense during its opening statement to the jury. *See* 434 U.S. at 511, 516 (according "highest degree of respect to the trial judge's evaluation of the likelihood" of juror bias, even though another judge might have proceeded with trial after giving cautionary instruction, and concluding that manifest necessity supported mistrial ruling).

Significantly, the *Arizona v. Washington* Court cautioned that a trial judge "'must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.'" 434 U.S. at 514 (quoting *United States v. Jorn*, 400 U.S. 470, 486 (1971) (plurality opinion)). The Court explained that, "[i]n order to ensure that this interest is adequately protected, reviewing courts have an obligation to satisfy themselves that, in the words of Mr. Justice Story, the trial judge exercised 'sound discretion' in declaring a mistrial." *Id.* Accordingly, "if a trial judge acts irrationally or irresponsibly, his action cannot be condoned." *Id.* (internal citations omitted). Because the *Arizona v. Washington* trial judge had "not act[ed] precipitately in response to the prosecutor's request for a mistrial," but rather had "evinc[ed] a concern for the possible double jeopardy consequences of an erroneous ruling" and provided "both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial," the Court was persuaded that the judge "exercised 'sound discretion'" and that the mistrial ruling was "supported by the 'high degree' of necessity which is required in a case of this kind." *Id.* at 515-16; *cf. Jorn*, 400 U.S. at 487 (concluding that trial judge failed to exercise sound discretion when he abruptly and sua sponte discharged jury, without hearing from parties or considering possibility of continuance).

We substantially relied on *Arizona v. Washington* for our decision in *Gilliam v. Foster*, wherein we framed the primary

issue before us as "whether the state trial judge *exercised sound discretion* in granting the prosecution's motion for a mistrial because the jury viewed certain photographs prior to their formal admission into evidence." 75 F.3d 881, 885 (4th Cir. 1996) (en banc) (emphasis added); *see also Perez*, 22 U.S. (9 Wheat.) at 580 (recognizing that trial courts "are to exercise a sound discretion on the subject" of whether "to discharge a jury from giving any verdict [because] there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated"). We explained in *Gilliam* that, under the sound discretion inquiry, "[i]f the grant of a mistrial by the trial judge amounts to an irrational or irresponsible act, he must be found to have abused his discretion in finding that manifest necessity for the mistrial existed." 75 F.3d at 894.

From the controlling Supreme Court precedent, we gleaned the following factors relevant to the sound discretion inquiry, i.e., "whether the exercise of discretion by the trial judge in granting a mistrial was sound as opposed to irrational or irresponsible":

> First, a reviewing court should look to whether a trial judge rationally could conclude that the grant of the mistrial was compelled by manifest necessity or whether the ends of public justice demanded that one be granted on the peculiar facts presented. In addition, a reviewing court may find relevant whether the trial judge acted precipitately or whether the trial judge expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alternatives less drastic than granting a mistrial.

*Gilliam*, 75 F.3d at 894-95 (internal citations omitted). Applying these factors to the *Gilliam* record, we determined "that neither manifest necessity nor the ends of public justice

required a mistrial," and that the trial judge had otherwise failed to exercise sound discretion in declaring one, in that he "acted precipitately," "never evinced any awareness that the grant of a mistrial might implicate or deprive Petitioners of their constitutional right to have the empaneled jury decide their guilt," and "ignored an obvious and adequate alternative to the grant of a mistrial." *Id.* at 901. We therefore ruled that the Double Jeopardy Clause barred a retrial of the petitioners. *See id.* at 905.

B.

Importantly, because this matter comes before us pursuant to Baum's 28 U.S.C. § 2254 petition for habeas corpus relief, our review focuses on the propriety of the State Decision of the Court of Appeals of South Carolina. We may award Baum relief only if the State Decision — which itself accorded deference to the trial judge's mistrial ruling in rejecting Baum's double jeopardy claim — can be found deficient under the highly deferential standards mandated by AEDPA. Those standards are contained in § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses, as well as in § 2254(d)(2)'s "unreasonable determination of the facts" provision. We emphasize "that it is Supreme Court precedent, and not Fourth Circuit precedent, to which we look in applying the AEDPA standard of review." *Bustos v. White*, 521 F.3d 321, 325 (4th Cir. 2008).[6]

---

[6]Our *Bustos* decision illustrates the proper application of AEDPA. The habeas corpus petitioner therein had claimed that, "because [he] was ineligible for parole, [his] attorney was constitutionally ineffective for failing to advise him of his parole ineligibility before he pled guilty." *Bustos*, 521 F.3d at 325. The district court awarded Bustos relief, concluding that, "although the Supreme Court had not addressed whether a parole-ineligible defendant must be advised of his parole ineligibility before pleading guilty, the Fourth Circuit had concluded that such a defendant must be so advised." *Id.* at 324. In reversing the district court, we observed that neither that court nor Bustos identified "any Supreme Court precedent clearly establishing the proposition that an attorney's representation is constitu-

In disposing of Baum's double jeopardy claim in the State Decision, the state court of appeals identified and applied controlling Supreme Court precedent, including *Arizona v. Washington* and *Illinois v. Somerville. See State v. Baum*, 584 S.E.2d 419, 422 (S.C. Ct. App. 2003). Accordingly, the State Decision did not contravene such precedent — and thereby qualify Baum for relief under § 2254(d)(1)'s "contrary to" clause — by relying on contradictory legal conclusions. *See Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (recognizing that, under "contrary to" clause, federal habeas court may grant writ if state court arrived at conclusion opposite to that reached by Supreme Court on question of law). Baum contends that he is otherwise entitled to "contrary to" clause relief, however, because the state court of appeals decided his double jeopardy claim differently than the Supreme Court has decided such a claim "on a set of materially indistinguishable facts." *Id.* at 413.

Additionally, Baum maintains that he qualifies for relief under § 2254(d)(1)'s "unreasonable application" clause, as well as § 2254(d)(2)'s "unreasonable determination of the facts" provision. Therefore, we assess whether the state court of appeals engaged in an "objectively unreasonable" application of Supreme Court precedent to the facts of Baum's case. *Williams*, 529 U.S. at 409 (citing § 2254(d)(1)'s "unreasonable application" clause). We also consider whether the court based its decision on an "objectively unreasonable" factual determination in view of the evidence before it, bearing in mind that "[f]actual determinations by state courts are pre-

tionally deficient when he fails to alert a defendant considering pleading guilty that he will not be eligible for parole," that "the Supreme Court ha[d] specifically declined to address that very question," and that "the majority of circuits deciding the issue" had ruled otherwise. *Id.* at 325. In those circumstances, as Judge Traxler explained, there was "no basis for determining that the state court decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court law." *Id.* at 326.

sumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing § 2254(d)(2), (e)(1)); *see also Lenz v. Washington*, 444 F.3d 295, 300-01 (4th Cir. 2006).

Baum relies on two contentions in seeking habeas corpus relief on his double jeopardy claim: first, that the state court of appeals should have applied strict scrutiny to the trial judge's mistrial ruling; and, second, that the court should have concluded, even without the application of strict scrutiny, that the trial judge abused his discretion in declaring the mistrial. We assess these contentions in turn, within the confines of the highly deferential standard of review mandated by AEDPA.

1.

We begin with Baum's contention that the state court of appeals should have applied strict scrutiny to the trial judge's mistrial ruling. As the Supreme Court recognized in *Arizona v. Washington*, "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." 434 U.S. at 508 (footnote omitted); *see also, e.g.*, *Downum*, 372 U.S. at 737 (concluding that second trial contravened Double Jeopardy Clause, where first jury discharged because prosecution failed to locate and serve subpoena on "essential" witness, and thereby "'entered upon the trial of the case without sufficient evidence to convict'" (quoting *Cornero v. United States*, 48 F.2d 69, 71 (9th Cir. 1931))). Significantly, however, the state court of appeals concluded that it could not deem Pinion's body to be "*critical* evidence in the prosecution of Baum such that its unavailability triggers the strict scrutiny announced in *Arizona [v. Washington]*." *Baum*, 584 S.E.2d at 422. The court explained that, "[a]s noted by Baum, the fact that Randall Pinion had been murdered was not in issue." *Id.*; *see also* J.A. 160 (acknowledgment in Baum's state court of appeals

brief that "the fact that the victim had been murdered was not contested"). The court further observed that the mistrial was declared on the ground that the body had "just as much potential to exonerate as to inculpate" Baum — not to afford the prosecution a tactical advantage. *Baum*, 584 S.E.2d at 422; *see also* Mistrial Order 2-3 ("The potential for exculpatory evidence being located with the body and the disposition site is significant and could potentially benefit or even exonerate the defendant.").

In these habeas corpus proceedings, Baum challenges the state court of appeals's characterization of the body as not being "critical" prosecution evidence, i.e., evidence necessary to the prosecution to obtain a conviction. Baum asserts that "evidence that the body of the victim had been found was important to establishing" the fact that Pinion had died, and he points to the trial judge's acknowledgment, in making his oral mistrial ruling, that the discovery of the body was a "significant revelation." Br. of Appellant 18-19 (citing J.A. 44). Baum further criticizes the notion that the mistrial ruling was premised on the possibility that the body would produce exculpatory evidence. According to Baum,

> [a]t the time of the trial judge's ruling, there was no evidence to suggest that the newly discovered, decomposed body could in any way exculpate the defendant. Any doubt on this matter was established by the defense's objection to the motion for a mistrial. At the second trial, the evidence tended to show that a full DNA profile could not be developed from the remains of the body because it was so decomposed. While the prosecution was able to use the partial DNA print to confirm the medical examiner's identification of the body from dental records as being that of Randall Pinion, it was very unlikely that a decomposed body would be able to provide a DNA sample sufficient to exculpate appellant.

*Id.* at 19 (internal citation omitted).

Unfortunately for Baum, he has failed to rebut, by clear and convincing evidence, the factual determination that Pinion's body did not constitute "critical" prosecution evidence. *See* 28 U.S.C. § 2254(e)(1). Rather, Baum merely asserts that the body was "important" and "significant" evidence, without contending — contrary to the determination of the state court of appeals — that the prosecution could not have obtained a conviction without the body. Of course, such an argument would be difficult for Baum to make, in that — as the state court of appeals recognized and Baum's brief to that court confirms — Baum himself acknowledged that "the fact that Randall Pinion had been murdered was not in issue." *Baum*, 584 S.E.2d at 422; *see also* J.A. 160.

Furthermore, Baum's contention that it was unreasonable to believe the body might lead to exculpatory evidence, because of its heavily decomposed state, is unavailing. The record reflects that, at the time the mistrial was declared, the body was just freshly discovered, and the trial judge did not know what evidence it would (or would not) reveal. The judge expressed a belief, however, that exculpatory evidence could be found not only "with the body," but also at "the disposition site." Mistrial Order 2. The record contains no evidence that the trial judge was on notice that the body was too decomposed to produce exculpatory evidence or that there was no possibility of locating such evidence upon examination of the surrounding site. Indeed, there has been no showing that, at the time of the mistrial ruling, *anyone* knew for sure that a search for exculpatory evidence would be a futile endeavor.[7]

---

[7]Despite Baum's suggestion to the contrary, the defense's objection to the prosecution's motion for a mistrial did not serve to put the trial judge on notice that exculpatory evidence could not possibly be found on or around Pinion's body. In making the objection, the defense simply explained, "We are here. We're ready for trial. And we're ready to proceed, Your Honor." J.A. 43.

Finally, Baum's theory that the trial judge should have known Pinion's body was too decomposed to reveal exculpatory evidence undermines any contention that the mistrial ruling was intended to afford the prosecution a tactical advantage. If the judge was aware that the body was too decomposed to reveal exculpatory evidence, he was also aware of the impossibility of discovering inculpatory evidence. And, it would have been apparent to the judge that the body could only constitute evidence of Pinion's death — evidence unnecessary to the prosecution, in that it undisputedly had at the ready sufficient alternative proof that Pinion had been murdered.[8]

In these circumstances, it was not objectively unreasonable for the state court of appeals to rule that Pinion's body did not constitute critical prosecution evidence, and that the purpose of the mistrial was not to bestow on the prosecution a tactical advantage over Baum. As such, the court properly refused, consistent with Supreme Court precedent, to apply strict scrutiny in its review of the trial judge's mistrial ruling.

2.

We turn to Baum's contention that the court should have concluded, even without the application of strict scrutiny, that the trial judge abused his discretion in declaring the mistrial.

---

[8]Baum has raised the additional argument in these habeas corpus proceedings that the prosecution sought the mistrial for reasons unrelated to the discovery of Pinion's body: specifically, (1) to bolster a weakness in its case revealed by Edie Pinion (the victim's wife and Baum's mother), who gave testimony damaging to the prosecution at the first trial but changed her testimony to Baum's detriment at the second; and (2) to secure an additional witness, Juanita Trueblood, who gave a statement to police inculpating Baum just two days after the mistrial was declared. This argument is not properly before us, however, because Baum failed to raise it in the state court of appeals. *See Kasi v. Angelone*, 300 F.3d 487, 501 (4th Cir. 2002) ("Before a court may address a claim raised in a federal habeas petition, the petitioner must have first exhausted the claim in state court." (citing 28 U.S.C. § 2254(b), (c))).

In assessing this contention, we utilize *Gilliam*'s analytic framework for performing a "sound discretion" inquiry. Under this framework, which was gleaned from controlling Supreme Court precedent, we first "look to whether [the] trial judge rationally could conclude that the grant of the mistrial was compelled by manifest necessity or whether the ends of public justice demanded that one be granted on the peculiar facts presented." *Gilliam*, 75 F.3d at 894. Next, we consider whether, on the one hand, "the trial judge acted precipitately," or whether, on the other hand, he "expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alternatives less drastic than granting a mistrial." *Id.* at 895. Of course, under AEDPA, we are constrained to accept the state court of appeals's answers to these questions so long as they were not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and providing they were not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d); *cf. United States v. Dunbar*, 987 F.2d 1054 (4th Cir. 1993) (reviewing double jeopardy claim on direct appeal).

a.

On the first question — "whether [the] trial judge rationally could conclude that the grant of the mistrial was compelled by manifest necessity or whether the ends of public justice demanded that one be granted on the peculiar facts presented," *Gilliam*, 75 F.3d at 894 — the state court of appeals focused on the unique circumstance of the discovery of Pinion's body. More specifically, the court recognized that, although the body did not constitute "critical" prosecution evidence, it was nevertheless "an extremely important piece of evidence which ha[d] just as much potential to exonerate as to inculpate" Baum. *Baum*, 584 S.E.2d at 422. According to the court, "manifest necessity" for the mistrial ruling was

"clearly established" by the trial judge's finding "that the public's interest in a fair adjudication was implicated by the possibility of discovering exculpatory evidence and giving the jury the benefit of the fully developed facts when deciding the matter." *Id.*

Notably, in discussing the amount of deference due to the trial judge, the state court of appeals invoked both Supreme Court and South Carolina decisions:

> Given the "varying and often unique situations arising during the course of a criminal trial," the United States Supreme Court has recognized a broad discretion reserved to a trial judge in declaring a mistrial. [*State v. Kirby*, 236 S.E.2d 33, 35 (S.C. 1977) (quoting *Somerville*, 410 U.S. at 462)]. A trial judge's decision to grant a mistrial will not be overturned absent an abuse of discretion amounting to an error of law. [*State v. Rowlands*, 539 S.E.2d 717, 719 (S.C. Ct. App. 2000)].

*Baum*, 584 S.E.2d at 422. The court thereby suggested that, like the trial judge's determination in *Arizona v. Washington*, the trial judge's mistrial ruling in Baum's case was "entitled to special respect." 434 U.S. at 510. Baum distinguishes *Arizona v. Washington*, however, on the ground that the mistrial therein — in contrast to the mistrial in his case — was declared out of concern for juror bias. He further maintains that, on the spectrum of necessity discussed in *Arizona v. Washington*, his "case falls closer to the end of the spectrum where manifest necessity does not exist because the mistrial was granted on the basis that critical prosecution evidence was unavailable." Br. of Appellant 26 (internal quotation marks omitted).

Even accepting Baum's position that the trial judge's mistrial ruling is entitled to little deference, Baum yet fails to establish that the State Decision was deficient enough to enti-

tle him to habeas corpus relief under AEDPA.[9] Baum attempts to convince us otherwise by drawing analogies to factually distinguishable cases in which manifest necessity was not found, and by conjuring up analogous hypothetical scenarios in which manifest necessity presumably would not be found. For example, in his appellate brief, Baum asserts that the logic underlying the State Decision's manifest necessity determination, that the jury should have the benefit of fully developed facts, "would cover any of the missing witness cases where the [Supreme] Court has determined that a mistrial was improperly granted." Br. of Appellant 34. And, at oral argument, Baum's counsel analogized this matter to a hypothetical sexual assault case where the prosecution proceeds to trial in reliance on eyewitness identification, but then moves for a mistrial to utilize newly announced, potentially inculpatory or exculpatory DNA testing. According to Baum, a mistrial in such circumstances would never be granted — and, thus, the mistrial in his case should not have been declared either.

Simply put, Baum's analogies and hypothetical scenarios are unhelpful to him. Although the Supreme Court has demonstrated a willingness to deduce some general principles from its established double jeopardy jurisprudence, *see Somerville*, 410 U.S. at 464 (recognizing that, generally speaking, "[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial"), the Court has admonished time and again that "virtually all of the cases turn on the particular facts and thus escape meaningful categorization," *id.*; *see also Jorn*, 400 U.S. at 485 ("The conscious refusal of this Court to channel the exercise

---

[9]In light of this conclusion, we need not reach an additional assertion raised by Baum: that the state court of appeals erred by invoking its earlier decision in *Rowlands*, for the proposition that a mistrial ruling will not be overturned absent an abuse of discretion amounting to an error of law, because such standard is incompatible with Supreme Court precedent.

of [judicial] discretion according to rules based on categories of circumstances reflects the elusive nature of the problem presented by judicial action foreclosing the defendant from going to his jury." (internal citation omitted)). Moreover, Baum has not identified a single Supreme Court case involving facts close enough to the facts here to compel a decision in his favor. *See Williams*, 529 U.S. at 413 (recognizing availability of habeas corpus relief under 28 U.S.C. § 2254(d)(1)'s "contrary to" clause if state court decided matter differently than Supreme Court has on "set of materially indistinguishable facts").

To be sure, the mistrial in question was declared as the result of an extraordinary event: the discovery of Pinion's body on the eve of Baum's trial and the body's identification just before the start of the trial's second day. Although Baum wished to proceed without delay, the judge believed the ends of public justice could only be served by a mistrial. The court of appeals expressed no hesitation in deeming the discovery and identification of Pinion's body to constitute manifest necessity for the mistrial; rather, the court declared such necessity to be "clearly established" by the trial judge's finding "that the public's interest in a fair adjudication was implicated by the possibility of discovering exculpatory evidence and giving the jury the benefit of the fully developed facts when deciding the matter." *Baum*, 584 S.E.2d at 422. Although we might consider manifest necessity a closer call than the state court of appeals apparently did, we cannot say that its determination was objectively unreasonable.

It is entirely understandable why the trial judge and the state court of appeals conferred special significance on the body as a potential source of evidence — and, particularly, as a potential source of exculpatory evidence. Baum was, needless to say, presumed to be innocent. And there are countless examples of exculpatory evidence (including DNA evidence) being recovered from victims of murder and other crimes. *See, e.g.*, *Thompson v. Connick*, 553 F.3d 836, 845 (5th Cir.

2008) (robbery conviction vacated as result of bloody swatch from victim's pants excluding Thompson as perpetrator); *Pierce v. Gilchrist*, 359 F.3d 1279, 1281 (10th Cir. 2004) (rape conviction vacated "[b]ecause DNA analysis demonstrated that Pierce could not have been the source of the semen found on the rape victim"); *Gomez v. Atkins*, 296 F.3d 253, 260 (4th Cir. 2002) (murder charge against Gomez dismissed due to exculpatory results of scientific tests on victim's fingernail scrapings and loose hairs found on her body); *see also* Rick Brundrett, *Questions of Innocence: Sometimes the Bad Guy Isn't the One Doing Time*, The State (Columbia, S.C.), July 4, 2004, at A1 ("A recent S.C. exoneration case involved Perry Mitchell, who was freed in 1998 after serving more than 14 years in prison for the 1982 rape of a teenage girl in Lexington County. He was convicted largely on the testimony of the victim; a DNA test later said he didn't do it.").

Because of the singular and potentially substantial evidentiary value of the victim's body to a murder case, it also was reasonable for the state court of appeals to endorse the trial judge's determination that further examination of Pinion's newly discovered body was justified to afford the jury the benefit of the fully developed facts. As the Supreme Court recognized in *Wade*, "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." 336 U.S. at 689. In light of this principle, the *Wade* Court approved of a second court-martial of the defendant even though the first was dissolved because of the absence of prosecution witnesses, because a tactical military situation — and not the prosecution's bad faith — had caused the witnesses to be unavailable. *Id.* at 691-92; *see also United States ex rel. Gibson v. Ziegele*, 479 F.2d 773, 775 (3d Cir. 1973) (rejecting double jeopardy claim where mistrial declared due to sudden illness of "key prosecution witness," which rendered him unable to take stand for at least one to two weeks). Here, the trial judge found that the belated

discovery of Pinion's body "was in no way a result of any act, omission, negligence, bad faith, or lack of effort on the part of the State," Mistrial Order 2, and that the potential evidentiary value of the body — not only as a source of exculpatory evidence for Baum, but also relevant evidence "imperative" to a just judgment by the jury — was "too great" to ignore, *id.* at 3. The state court of appeals agreed with the trial judge's manifest necessity determination, and we also must say that it was a rational one.[10]

b.

Next, we consider whether the trial judge otherwise exercised sound discretion in declaring the mistrial — that is, "whether the trial judge acted precipitately," or whether he "expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alternatives less drastic than granting a mistrial." *Gilliam*, 75 F.3d at 895. This issue was not explicitly addressed in the State Decision. We nevertheless agree with the district court that, "[a]lthough the South Carolina Court of Appeals did not specifically indicate it found the trial judge made a reasoned decision, with those exact words, it is clear that the court of appeals reviewed the trial court's decision and found it appropriate based on sound discretion." District Court Opinion 10. In these circumstances, "we still apply [AEDPA's] deferential standard of review" in considering the sound discretion question, but "we must conduct an independent review of the record and the applicable law to make the [AEDPA] determinations." *Fullwood v. Lee*,

---

[10]Baum points out that, although retrial may be proper where a trial judge grants a mistrial "'in the sole interest of the defendant,'" Br. of Appellant 17 (quoting *Gori v. United States*, 367 U.S. 364, 369 (1961)), this was not such a case. Plainly, however, neither the State Decision nor our decision today relies on the proposition that the mistrial was declared for Baum's sole benefit.

290 F.3d 663, 677 (4th Cir. 2002) (citing *Bell v. Jarvis*, 236 F.3d 149, 158, 163 (4th Cir. 2000) (en banc)).

The record reflects that, at the start of the second day of Baum's trial just after the body had been identified as Pinion's, the trial judge conducted an off-the-record conference in his chambers, during which, according to the parties, the prosecution announced the discovery of the body. The judge then conducted proceedings in open court, outside the presence of the jury. At that time, the prosecution moved for a trial continuance or a mistrial, described the events surrounding the discovery and identification of Pinion's body, and argued the merits of the continuance-or-mistrial motion. The defense was afforded an opportunity to respond — and it did so, registering its objection to the prosecution's motion on the ground that Baum was "ready to proceed." J.A. 43. The judge then announced his decision to declare a mistrial, explaining that it was "a matter of manifest necessity," in that there was good cause shown (and no bad faith demonstrated) by the prosecution, and that further examination of the body "could enure to the benefit of the defendant." *Id.* Furthermore, the judge evinced an awareness of the ramifications of his mistrial ruling, by discussing the manifest necessity issue and specifying that "jeopardy will continue." *Id.*

Thereafter, in his written Mistrial Order, the judge reiterated the reasons for his manifest necessity determination and emphasized that he ruled only "after careful review of all the circumstances and the possible alternatives to granting a mistrial." Mistrial Order 3. The judge also acknowledged our *Gilliam* decision and found "that there was no other alternative available to the court to resolve this matter." *Id.* As to the possibility of a trial continuance, the judge observed that "to suspend the trial of the case and allow the sitting jury to resume the trial approximately two months later would be fundamentally unfair to all concerned (especially Defendant and the jurors) and contrary to the ends of justice." *Id.*

Baum contends that "[t]he short amount of time that passed between the request for a mistrial or continuance and the granting of the mistrial demonstrates that the trial judge failed to meaningfully consider the continuance alternative." Br. of Appellant 31. Although the proceedings leading up to the mistrial ruling (or at least the proceedings in open court) were indeed brief, there is no indication that the trial judge restricted the parties' opportunity to be heard or otherwise acted precipitately. Rather, the judge heard all the argument the parties apparently wished to give, expressed concern about the jeopardy issue, and, as reflected in the Mistrial Order, considered and rejected a trial continuance as a possible alternative to a mistrial.

Baum also attacks, for lack of support in the record, the judge's finding that a two-month continuance would have been necessary. Yet Baum fails to rebut such finding by clear and convincing evidence, asserting only that the prosecution's "willingness to pursue this option reveals that the continuance would not have been for nearly so long a period of time." Br. of Appellant 30 n.19. The finding of the judge — who was in a far better position than any reviewing court to evaluate the likely length of delay and its probable effects on Baum and the jury — simply cannot be overturned on such a flimsy basis. Moreover, even if another judge might have granted a continuance instead of a mistrial, this judge was not obligated to do so. *Cf. Arizona v. Washington*, 434 U.S. at 511 (according "highest degree of respect" to judge's mistrial ruling, even though "some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions"). Put succinctly, whereas the judges in *Jorn* and *Gilliam* acted irrationally and irresponsibly, *see Jorn*, 400 U.S. at 487 (judge abruptly and sua sponte discharged jury, without hearing from parties or considering continuance option); *Gilliam*, 75 F.3d at 895 (judge acted precipitately, failed to acknowledge defendants' interest in proceeding before empaneled jury, and ignored obvious and adequate alternative to mistrial), the judge in this case can reasonably be said to have exercised

sound discretion. That is, such a conclusion is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.[11]

### IV.

Pursuant to the foregoing, we affirm the district court's dismissal of Baum's 28 U.S.C. § 2254 petition for habeas corpus relief.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

In nine short sentences immediately following the prosecution's motion for a continuance *or* mistrial, the trial court in this case declared a mistrial without adequately considering reasonable alternatives to what was undoubtedly a drastic course of action. A month later, the court issued a written order setting forth constitutionally insufficient justifications for its actions. Under these circumstances, I cannot conclude that "the trial judge expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of

---

[11]Finally, Baum makes two additional arguments that merit our attention. First, Baum asserts that, because Pinion's body was found two days before the trial began and jeopardy attached, the prosecution cannot rely on the discovery of the body to establish manifest necessity for the mistrial ruling. Fatal to Baum's contention, the body was not identified as Pinion's until the second morning of trial, just before the mistrial was declared, and Baum has otherwise failed to rebut the trial judge's finding of a lack of bad faith or neglect on the prosecution's part. Second, Baum maintains that the record does not support the trial judge's statements, in the Mistrial Order, that "it was imperative upon the State to proceed to trial without further delay" and that "there was an order requiring the case to proceed to trial." Mistrial Order 2. According to Baum, there was an order in place only to the effect that Baum would be entitled to bond if he were not tried by September 30, 2000. Although Baum appears to be correct on this point, the purported order to proceed was not central to the mistrial ruling or the State Decision.

a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alternatives less drastic than granting a mistrial." *Gilliam v. Foster*, 75 F.3d 881, 895 (4th Cir. 1996) (en banc), *cert. denied*, 517 U.S. 1220 (1996).

## I.

The majority has thoroughly set forth the facts, and I do not read them differently. Relevant to my consideration, however, is the following: On October 10, 2000, the second day of Baum's trial, the prosecution moved for a continuance or mistrial based on the discovery of Pinion's body. At that point, the jury had been sworn in and had heard the testimony of three witnesses. Baum opposed the motion, but the trial court granted it. In granting the mistrial, the court stated, in its entirety:

> I'm going to declare a mistrial. I have received an affidavit from the dentist. Based on his review of the situation and a conference with the medical examiner for the state of North Carolina, based on the level of certainty that this may, indeed, be the remains of Mr. Pinion, that a mistrial is warranted for good cause, not the result of anything caused or done, an act or omission by the state. I feel this is a matter of manifest necessity and that jeopardy will continue. Jeopardy does not attach and begin anew in my firm judgment, and I so rule that this is a matter of manifest necessity that potentially could inure to the benefit of the defendant. A key issue in the case was the fact that the body had not been found. This revelation is significant. And if it actually turns out, based on the scientific examination, that this is indeed the remains of Mr. Pinion, then this case should well not continue and be retried at another date.

> Again, I note jeopardy will continue, and that's my ruling in the case.

(J.A. 43-44.) On November 8, 2000, approximately one month after the court granted the state's motion for a mistrial, it issued a written order explaining its reasoning for doing so.

At Baum's second trial, he argued that the Double Jeopardy Clause barred the proceedings, but the judge denied the motion, noting, "I agree with your argument, but I can't grant you the relief simply because under the existing case law of this state the previous trial judge has tied my hands and I have no authority to override his order." (J.A. 65.) On January 24, 2001, the jury found Baum guilty, and the judge sentenced him to life in prison.

## II.

The Double Jeopardy Clause of the Fifth Amendment mandates that no "person be subject for the same offence to be twice put in jeopardy of life or limb." The Supreme Court has instructed that "[w]e resolve any doubt in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion." *Downum v. United States*, 372 U.S. 734, 738 (1963) (internal quotation omitted).

In *Arizona v. Washington*, the Supreme Court recognized that a second trial "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." 434 U.S. 497, 503-04 (1978) (internal footnote omitted). Thus, "in view of the importance of the right [to freedom from double jeopardy], and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one." *Id.* at 505.

In *Gilliam v. Foster*, this Court noted, "If the grant of a mistrial by the trial judge amounts to an irrational or irresponsible act, he must be found to have abused his discretion in finding that manifest necessity for the mistrial existed." 75 F.3d at 894. In making this assessment, the Court, construing Supreme Court precedent, set forth two prongs for a reviewing court to consider: first, "whether a trial judge rationally could conclude that the grant of the mistrial was compelled by manifest necessity or whether the ends of public justice demanded that one be granted on the peculiar facts presented." *Id.* Additionally, a court should consider whether the judge "acted precipitately or whether the trial judge expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alternatives less drastic than granting a mistrial." *Id.* at 895.

Applying these factors to the present case, first, the trial court's rationale behind its finding of manifest necessity was grossly insufficient. At trial, the court's primary reason for declaring the mistrial was that it viewed Pinion's body to be crucial evidence without which a trial could not proceed. Yet both the state and the appellant were prepared to proceed to trial without the body. The state was prepared to present what it thought was sufficient evidence to support its theory that Baum murdered his stepfather ("I believe myself and the family who are here behind me are as ready as the defendant himself to get this behind us." (J.A. 43)), and the defense was prepared to defend against such a theory ("We are here. We're ready for trial. And we're ready to proceed, your honor." (*Id.*)). Neither side depended on Pinion's body for its case. Thus, the body could not have reasonably been viewed as crucial evidence whose absence would undermine the trial.

Notably, the trial court did not consider at the time of the mistrial declaration whether there were alternatives to a mis-

trial, and it did not hear extensive argument on the appropriateness of the mistrial.

> In order to determine if the mistrial was required by manifest necessity, *the critical inquiry is whether less drastic alternatives were available.* If alternatives existed, then society's interest in fair trials designed to end in just judgments was not in conflict with the defendant's right to have the case submitted to the jury.

*United States v. Shafer*, 987 F.2d 1054, 1057 (4th Cir. 1993) (internal quotations and citations omitted) (emphasis added); *see also Harris v. Young*, 607 F.2d 1081, 1085 n.4 (4th Cir. 1979) ("If obvious and adequate alternatives to aborting the trial were disregarded, this suggests the trial judge acted unjustifiably.").

There is no indication in the record as to why a two-month suspension of Baum's trial would have been necessary in order to examine the body properly. As we noted in *United States v. Sloan*, "'Speculation . . . cannot serve as a basis for manifest necessity.'" 36 F.3d 386, 400 (4th Cir. 1994) (quoting *United States v. Allen*, 984 F.2d 940, 942 (8th Cir. 1993)) (alteration in original). In actuality, the coroner's report was ready at the end of the day the mistrial was actually granted. At most, therefore, the trial would have had to have been suspended only a short period of time in order to allow each side to assess the newly acquired evidence. *See, e.g.*, *Dunkerley v. Hogan*, 579 F.2d 141, 148 (2d Cir. 1978) ("[T]he apparent availability of at least one alternative to a mistrial—adjourning the trial for 7 to 10 days—leads us to conclude that a mistrial was not a 'manifest necessity.'"). Tellingly, the prosecutor asked for either a continuance *or* a mistrial. Thus, even the state thought that a continuance would have been sufficient to consider the new evidence.

Of course, the trial court did not know at the time how long it would take to examine Pinion's body, and deference is

owed to the court in its assessment of whether a continuance is warranted. But deference is not blind approval, and "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." *Washington*, 434 U.S. at 510 n.28; *see also Gilliam*, 75 F.3d at 900. The record in this case presents absolutely no justification for the trial judge's two-month estimate. As the *Gilliam* Court aptly noted in that case:

> If the situation facing this state trial court could be found to support a conclusion that manifest necessity or the ends of public justice required the grant of a mistrial, those words have little meaning, and the standard for trial judges to employ in deciding the appropriateness of the grant of a mistrial may as well be articulated in terms of whether a trial judge in good faith deems the mistrial advisable. Moreover, if the circumstances surrounding the grant of this mistrial could be found to sustain a determination that the state trial judge exercised sound discretion in granting a mistrial, there would be little point to providing any level of judicial review of such decisions.

75 F.3d at 903. Similarly, the *Sloan* Court concluded that, "[i]f the court below had explored alternatives, it would have had to recognize that declaration of a mistrial was unnecessary." 36 F.3d at 400. Likewise, had the trial court taken the reasonable course of action in this case and granted even a short continuance to properly ascertain how quickly information could be gathered, it likely would have discovered that, due to the state of the body's decomposition and the limited amount of evidence that could be gathered from it, the potential for undue delay did not necessitate a mistrial.

To compound the injury, the court's written order supporting the mistrial declaration, issued approximately one month after the oral declaration, did little to justify its actions. The

court found that because Baum had been unable to post bond, "it was imperative upon the State to proceed to trial without further delay" (no explanation as to how this factors into the mistrial calculus); that there was no other alternative to mistrial (no explanation); that it would have been too risky not to examine the body (a mistrial was not necessary to do this); that evidence could have been favorable to the defense (possible, but still not a justification for a mistrial); and that "to suspend the trial of the case and allow the sitting jury to resume the trial approximately two months later would be fundamentally unfair to all concerned . . . and contrary to the ends of justice" (again, no support for this two-month estimate). (J.A. 46-47.)

The written order did not, under any reasonable reading, adequately address why a continuance would not be sufficient or whether the court considered any other alternatives to a mistrial. "A judge cannot find that manifest necessity requires declaration of a mistrial 'until a *scrupulous* exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.'" *Sloan*, 36 F.3d at 393-94 (quoting *United States v. Jorn*, 400 U.S. 470, 485 (1971) (plurality) (emphasis added)). AEDPA requires us to give deference to state court decisions. But AEDPA does not require us to turn a blind eye to a mistrial declaration that flies in the face of the Constitution and Supreme Court precedent.

### III.

The record in this case reveals that the state trial court impermissibly ended Baum's first trial and unnecessarily opened the courthouse doors for a second prosecution. We must not take lightly the harm that results from being twice subjected to jeopardy. Likewise, we must not denigrate the defendant's "valued right to have his trial completed by a particular tribunal." *Washington*, 434 U.S. at 503 (internal quotation omitted). Even if I were to assume, as the majority holds,

that strict scrutiny does not apply to this case, I am convinced that the state trial court abused its discretion in declaring a mistrial for manifest necessity and that such abuse was contrary to clearly established Supreme Court precedent. Thus, I am compelled to dissent.